Commonwealth *v.* Jones, Appellant.

542

Argued March 24, 1941. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Philip Sidransky* and *Ralph C. Davis*, for appellant,

*Earl R. Jackson*, Assistant District Attorney, with him *Andrew T. Park*, District Attorney, for appellee.

OPINION BY MR. JUSTICE PATTERSON, April 14, 1941:

Willie Jones, appellant, was indicted and tried for the murder of Frank Akerson, of McKeesport, Pennsylvania. The jury returned a verdict of guilty of murder in the first degree and fixed the penalty at death. Appellant's motion for a new trial having been refused and judgment having been entered and sentence of death imposed, he has taken this appeal, claiming that the record discloses trial errors which deprived him of a full, fair and impartial trial such as he was entitled to.

Akerson, who was a meat-packing company foreman, was shot and mortally wounded at about 12:30 in the morning of June 1, 1940, as he was walking near the corner of Locust Street and School Alley, McKeesport, on his way home from work. He was taken to a near-by doctor's office by persons attracted to the scene by the shot, where the doctor informed him that he had not long to live, and thereafter was removed to the McKeesport Hospital, where he died at 10:21 the same morning. Before dying, Akerson stated to his wife that he had been followed and hailed by a colored man, that he, Akerson, asked the man what he wanted, that just then a car approached and he shouted for help, whereupon the colored man, while he "still had his hands up", "let him have it", and he stated to one of his employers, "You know that nigger shot me down like a dog". Death was ascribed to hemorrhage and shock due to a gunshot wound entering the chest through the arm-pit beneath the right arm, severing the spinal cord.

A Mrs. Edna Phillips, whose detailed description was largely responsible for appellant's apprehension as a suspect, positively identified him as the man whom, as she testified at the trial, she observed from her bedroom window, running from the scene of the shooting, 125 feet away, and stopping under her window, beneath a street light, to put "something" into his pocket. And, during the investigation of the crime, appellant himself identified one John Ryan, who testified that on the night of the killing appellant had followed him for several blocks and hailed him as he turned into his home, located near the scene of the crime, where he arrived between 12:00 and 12:15 a. m., as "the man that I followed up Locust Street that fooled me and went into the house".

Appellant was taken into custody for questioning on June 3, 1940. At first he denied any participation in the shooting, stating that he had not been out of his rooming house on the night in question and that at the time of the shooting he was in bed with his alleged girlfriend, one Anna Lou Davis, who lived at the same address. The truth of this assertion having been denied by the girl, appellant said that on the night of the shooting he had left his home at 11:18 p. m. and burglarized the house of one George Raback, but had returned by 12:25 a. m. When this statement was likewise proved to be false, the burglary having taken place on May 30, 1940, the night prior to the night of the killing, appellant, on June 7, 1940, made and signed a detailed written statement in which he admitted participating in an attempt to rob Akerson with a man named Spencer who, as it was subsequently learned, could have had no possible connection with the crime, but stated that Spencer fired the fatal shot. On June 8, 1940, appellant wrote a letter to the aforementioned Anna Lou Davis, asking forgiveness "for participating in that heinous crime", referring to the killing of Akerson, as he admitted, and thereafter, on June 13, 1940, he stated

that "he wanted to get it over with, he was going to tell everything", whereupon he made a statement, later repeated in a more detailed statement given to the District Attorney, on June 17, 1940, which was reduced to writing and signed by appellant, relating that he alone intercepted Akerson, asking if there were any "good time houses" in that locality, that Akerson made an insulting remark to him and he thought Akerson was reaching for a gun, when he, appellant, pulled his gun from his pocket and it accidentally discharged.

On the following day, June 14, 1940, appellant pointed out where he had thrown the gun into the Youghiogheny river, and, on June 15, 1940, one John Phar delivered to the authorities a gun which he had found imbedded in the mud of the bank of the river at a point near that indicated by appellant. This gun was identified by appellant as his gun with which he had shot Akerson, and it was shown by the testimony of a ballistic expert, called by the Commonwealth, to have been the gun from which the bullet taken from the body of Akerson had been fired. In his statement of June 17, 1940, appellant detailed his movements on the streets prior to the shooting. He stated that after he had shot Akerson he returned to the unused attic of his rooming house, where he hid the gun behind a loose brick in the chimney, and that he threw it in the river the following day because, as they testified at the trial, his landlady and her niece had discovered that he had been in the attic and were curious as to his purpose in going there. He further stated that he identified the gun as his gun by the series of numerals appearing on its butt end, the first three figures of which he used in combination, in "playing the numbers".

At the trial appellant completely repudiated his statements and admissions, asserting that they had been procured by fear and abuse, and he denied that he was present at the time of the shooting, denied that he had ever owned the gun, and denied that he had shot Akerson

or had ever seen him. He testified that he was at home at the time of the shooting, having arrived there about 12 : 07 a. m., which testimony was in no way corroborated. On this appeal the assignments of error, many of which are trivial and relate to matters which were not objected to, are principally directed against (1) the admission in evidence, as a dying declaration, of Akerson's statement to his wife as to the circumstances of the shooting, (2) the admission of appellant's signed statements, (3) the cross-examination permitted of appellant and of his character witnesses, and (4) against the charge as a whole.

The contention that it was error to admit the statement of Akerson to his wife, as a dying declaration, is without merit. "Whenever the victim of an assault is in a dying condition, and realizes it, his statements concerning the cause of his injuries are admissible in evidence. . . . His knowledge may appear from declarations made to or by him. The nature of the wounds is also important as bearing on the injured party's knowledge of his condition: *Kehoe v. Com.*, 85 Pa. 127, 136. As stated in Wigmore on Evidence (2d ed.), volume 3, page 172: 'We may avail ourselves of any means of inferring the existence of such knowledge [that the declarant knew he was about to die] ; and if, in a given case, the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude' ": *Com. v. Guida*, 298 Pa. 370, 376. See also *Com. v. Lockett*, 291 Pa. 319, 323; *Com. v. De Leo*, 242 Pa. 510, 516. "Whether the belief in the approach of death was present is addressed in the first instance to the conscience of the court *(Com. v. De Leo*, 242 Pa. 510), but, after admission of the testimony, it is not error to charge that the jury, before considering the declaration, should be satisfied of the existence of this *thought* in the mind of the deceased at the time of its utterance": *Com. v. Puntario*, 271 Pa. 501, 504.

Here the deceased was informed by the physician, to whose office he was taken immediately after the shooting, that he "had not long to live" and that his family should be notified. Later, at the hospital, and shortly before making the statement in question, he himself stated that "he *thought* he was dying". In view of the nature of his injuries, his spinal cord being severed, the information given him with no hope of recovery, his own statement indicating that he was fully aware of the seriousness of his condition, and the fact of his death following within a few hours, less than ten hours after the shooting, it may safely be assumed that Akerson realized he was about to die. The court, in its charge, carefully pointed out to the jury that Akerson's statement had not been made under the sanctity of an oath; also that it was made at a time when appellant was not present, and without opportunity for cross-examination. The jury was instructed that "if Mr. Akerson, when he made the statements [to his wife], realized that he was about to die and pass into the presence of his Maker, if he had no hope of recovering, then you should consider these statements and give them such weight as you find they are entitled to receive at your hands", but that "if, on the other hand, you are not satisfied that he realized he was about to die, and you find that he had hopes of recovering, then ignore them and give them no consideration whatever". There can be no doubt of the competency of the statement, as a dying declaration, under all our cases, and the instructions of the court as to the weight to be given such evidence were adequate.

It is urged that the written statements made and signed by appellant on June 7, 1940, and June 17, 1940, in each of which he states that it is made voluntarily and with knowledge that it may be used against him in court, should not have been admitted because he was being held in custody at the time and was denied the right to procure an attorney, because he was accused

of lying and those having him in charge assumed his guilt during prolonged questionings, because of the application of a lie detector during the interrogations, and because the statements had been forced from him by physical abuse and torture. "The mere fact that the defendant was under arrest, or was in the charge of armed police officers when he made his confession, will not make a confession involuntary": *Com. v. Spardute,* 278 Pa. 37, 47. See also *Com. v. James,* 294 Pa. 156, 161; *Com. v. Cavalier,* 284 Pa. 311, 315. Nor are the statements invalidated by reason of the fact that appellant was not represented by counsel, no request for such representation ever having been made: *Com. v. Spardute,* supra, 46. Similarly, the admissibility of the statements is not affected by the fact that in the interrogations appellant was accused of lying or because his guilt was assumed: *McClain v. Com.,* 110 Pa. 263, 269; *Com. v. Spardute,* supra, 48. And, the application of a lie detector did not vitiate the statements. See *Com. v. Hipple,* 333 Pa. 33, wherein it was expressly held that an objection based on the fact that a confession was thus induced cannot be sustained, this Court pointing out, at page 39, that "A confession procured by a trick or artifice, not calculated to produce an untruth, is never vitiated thereby".

While appellant testified that they were procured through fear and abuse inflicted upon him by those having him in custody, the witnesses to the statements testified that no force or coercion was used. "Where, by the Commonwealth's witnesses, it is shown that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted. If afterwards the defendant testifies, or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury: *Com. v. Aston,* 227 Pa. 112, 115, 116; *Com. v. Shew,* 190 Pa. 23, 24; *Com. v. Epps,* 193 Pa. 512, 515; *Com. v. Van Horn,* 188 Pa. 143, 168; *Com. v. Shaffer,* 178

Pa. 409, 414; *Volkavitch v. Com.*, 9 Sadler 327; Underhill on Criminal Evidence, 2d ed., section 126, p. 242": *Com. v. Spardute,* supra, 48. The circumstances attending the making of appellant's statements were unquestionably for the jury's consideration under proper instructions by the court, which were given, as follows: "Now, if you find, members of the jury, that he [appellant] was coerced and compelled by reason of force and violence and threat or otherwise, intimidation of any kind, to make the statements, then they are not his voluntary statements and you should ignore them entirely and give them no consideration whatever. But if you find that he made these statements voluntarily as stated in the statements, then you will give them consideration and determine what is the real truth of the matter". See *Com. v. Farrell*, 319 Pa. 441, 444.

The complaint that the court erred in permitting appellant to be cross-examined as to the commission of unrelated offenses admitted in his first statements to the authorities, which statements he contradicted in the subsequent statements and by his testimony at the trial, is also lacking in substantial merit. As was said in *Com. v. Karmendi*, 328 Pa. 321, 328: "Many decisions of this Court have held that the making of false and contradictory statements by the accused, with the intent to mislead the police and divert inquiry or suspicion, is indicatory of guilt: *Com. v. Spardute*, 278 Pa. 37, 43; *Com. v. Jones*, 297 Pa. 326, 333; *Com. v. Danarowicz*, 294 Pa. 190, 193; *Com. v. Hadok*, 313 Pa. 110". The statements were, therefore, admissible, and not merely partially, but in their entirety. "If a voluntary confession is made to police officers, the whole is admissible in evidence, even though it may contain admissions of other offenses unrelated to the one for the commission of which the defendant is on trial: *Com. v. Weston*, 297 Pa. 382; *Com. v. Dague*, 302 Pa. 13": *Com. v. Gable*, 323 Pa. 449, 452. See also *Com. v. Hipple,* supra, 40. As the statements containing the ad-

missions relative to the offenses were admissible, and the responses elicited by the questions objected to were no more prejudicial than the statements themselves, there is no just cause for complaint.

Equally untenable is the contention that it was error to permit appellant's two character witnesses, testifying to his reputation for "peace and good order", to be questioned, on cross-examination, as to other crimes with which he had been charged, directly relating to the trait of character involved. While it is true that questions pertaining to specific offenses cannot be asked character witnesses as "rebuttal" of evidence of good reputation (*Com. v. Jones*, 280 Pa. 368, 370), as was stated in *Com. v. Becker*, 326 Pa. 105, 114-15, "A distinction is drawn between cases where it is sought to prove particular acts of misconduct and those where the purpose of the examination is to test the accuracy of the testimony by showing either that the witness is not familiar with the reputation concerning which he has testified or that his standard of what constitutes good repute is unsound. . . . The admission of testimony of good reputation is of doubtful value and often deceptive where there is not applied to it the acid test of cross-examination to prove the accuracy of the testimony and the standard by which the witness measures reputation". We have carefully considered the portions of the record involved and are convinced that the purpose of the cross-examination was solely to test the reliability of the character witnesses, as the prosecution stated at the trial, and not to show that appellant had committed other specific offenses for which he was not on trial; hence, the objection cannot be sustained: *Com. v. Becker*, supra. In any event, we are satisfied that none of the questions, or responses thereto, could possibly have had any serious effect upon the jury's verdict, and complaint concerning them is, therefore, unavailing.

Objections that the charge was inadequate, misleading and prejudicial are entirely without basis in the record. Such misstatements of fact as may have inadvertently crept into the charge could not possibly be regarded as having prejudiced appellant, particularly in view of the court's caution to the jury that its own recollection of the testimony, and not the court's, should be relied upon in case of any conflict. If the charge referred at greater length to the evidence of the Commonwealth, it was only because more evidence was offered on that side of the case and, under these circumstances, it was proper that it should do so: *Com. v. Riggs,* 313 Pa. 457, 460; *Com. v. Becker,* supra, 112. Isolated excerpts torn from the heart of the charge cannot be considered apart from their context, and if the whole is accurate and fair, the parts objected to do not form a proper basis for reversal: *Com. v. Schurtz,* 337 Pa. 405, 411; *Com. v. Stelma,* 327 Pa. 317, 323; *Com. v. Glenn,* 321 Pa. 241, 248; *Com. v. Touri,* 295 Pa. 50, 58. Taken as a whole, the charge fairly and sufficiently sets forth the essential evidence in the case and the law applicable thereto.

The court's expression of opinion that, if found guilty of murder in the first degree, appellant "ought to receive the severest penalty" is not objectionable, since the jury was specifically instructed that "it is only my judgment and you are not to be influenced or bound in any manner or degree by any opinion I have". "The trial judge is at liberty to express an opinion as to the guilt or innocence of the accused and the penalty to be inflicted, provided he does not inflame or arouse the jury, and provided also that he makes it clear that the jury is absolutely free to decide those questions regardless of his opinion": *Com. v. Edwards,* 318 Pa. 1, 5-6. See also *Com. v. Nafus,* 303 Pa. 418, 421; *Com. v. Stabinsky,* 313 Pa. 231, 234; *Com. v. Gable,* supra, 455.

Because a man's life is at stake, we have seriously considered all the assignments of error, discussing such

as, in our opinion, are of sufficient materiality to warrant discussion, and find reversible error in none of them. Upon a review of the entire record, we are satisfied that it discloses a homicide with all the elements of murder in the first degree, and that the jury was amply justified in so finding. In view of the circumstances disclosed, the conviction was just and the death penalty appropriate.

The assignments of error are overruled, the judgment is affirmed, and the record is remitted for the purpose of execution.