Commonwealth *v.* Chambers, Appellant.

Argued November 20, 1950.  Before Drew, C. J., Stearne, Jones, Bell, Ladner and Chidsey, JJ.

*Albert S. Oliensis,* with him *Maxwell L. Ominsky,* for appellant.

*Colbert C. McClain,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, March 21, 1951:

This is the second time the defendant was convicted of first degree murder and at each trial the jury in their verdict imposed the death penalty. The defendant in this appeal raises two narrow but very important questions: (1) "Must a suspect in a capital case, prior to police questioning, be furnished counsel or at least advised of his right to counsel and to remain silent upon questioning"; and (2) Did the trial judge commit reversible error in his charge to the jury concerning a man named Phillips? The first question has been ruled adversely to the appellant in a companion case, *Commonwealth v. Bryant,* 367 Pa. 135, 79 A. 2d 193; and we shall therefore proceed to a determination of the second question involved.

Joseph Saturno, 65 years old, was found dead in his apartment, 616 Pemberton Street, Philadelphia, about 6:25 p.m. on November 8, 1948. The deceased had been terribly beaten and mutilated, with about 20 wounds in the head; and his apartment was a shambles, with blood over everything. Detectives arrived at the scene of the crime shortly thereafter and as a result of a tip went to defendant's home at 633 Kenilworth Street, less than a block from the deceased's apartment. Defendant was shot by the detectives while he was attempting to escape and was then taken to a hospital. Detectives Lear and O'Donnell were permitted to testify, over objections of counsel, that they questioned defendant at the hospital and that *defendant admitted be-*

*ing the lookout* while his co-defendant, Bryant, and another man, Phillips, beat the decedent to death.

Phillips was then brought to the hospital and identified by defendant. Next morning defendant was taken to Detective Division Headquarters and once more questioned. His statements were then reduced to writing, although not signed by him, and his written statement detailing this exceptionally brutal murder, was read in evidence by Detective Steinberg, over the objections of defendant's counsel. Phillips was again implicated in the crime by defendant.

Later the same day defendant signed. a confession similar to the ones he had made on the two previous occasions above mentioned. At this time he was warned that any statement he made would probably be used against him at the trial of his case. Once again defendant connected Phillips with the killing.

Both Chambers and Bryant confessed that they had come to Saturno's apartment to rob him and gave details of the brutal beating administered to Saturno and how they ransacked his apartment in their search for money, but each blamed the actual beating of Saturno on the other. Bryant's confession was not used or read in defendant's trial. Defendant makes no contention that his confessions were involuntary or coerced or that he did not have a fair trial (except as to the two matters which he specifically raised in his aforesaid statement of the questions involved).

In each of defendant's confessions he implicated, as above mentioned, a man named *"Phillips"* as having, with Bryant, beaten the deceased to death. Phillips denied this when he was arrested by the police in his bedroom about 2 a.m. the morning after the murder and also when Chambers accused him of it at the hospital and again at the Coroner's Inquest, as well as at defendant's trial.

Phillips testified at defendant's trial that defendant knocked him unconscious in a crap game on the afternoon of November 8th and that defendant's mother washed the wound; that Phillips then went to the Pennsylvania Hospital at about 4:15 p.m.; that he left the hospital *around 5 o'clock* and went to the house of Robert Magil, 638 Bainbridge Street, which is less than a block from Saturno's apartment; that he then went home, had supper and because his head hurt him, went right to bed; and that defendant lied when he said that Phillips had anything to do with the murder.

Detective O'Donnell testified that defendant (Chambers) definitely told him that Phillips got the patch on his head in his fight with Pop Saturno. Detectives O'Donnell and McColgan each testified that he had investigated these conflicting statements and found out from the hospital records and elsewhere that Phillips received the injury prior to 4:30 on the day of the murder; that they had also investigated Phillips' statement that he had nothing to do with the murder and that they had no proof that he participated in or had any connection with the murder of Saturno. The court then said: "Q. Let's dispose of Phillips. Did you check to see where Phillips was from the time he was discharged from the hospital until the time he was arrested? Did you make an investigation of that matter? A. Yes, we did. He told us the same story he told on the stand here. Q. Where did you ascertain where Phillips was, home in bed? A. We had nothing to prove that he was anywhere else. . . . The Court: He told you all the discussions up to that time, which would determine the status of Phillips. *Now, Phillips is out.* Q. All right. *What happened after Phillips is eliminated?*"*

---

* Italics throughout, ours.

It is also a fact, for what it is worth, that Phillips was exonerated by the Coroner.

Defendant contends that the veracity of his story about Phillips was of very great importance to him because if the jury believed defendant was only a lookout and that the brutal beating had been committed by Bryant and Phillips and not by him, the sentence might have been life imprisonment instead of death. With this contention we agree. In the light of this we shall examine the court's charge to which the defendant objects.

The court charged: "The first thing this man did was *implicate an innocent man who has successfully established an alibi and who has been vindicated in the community. He had nothing to do with it.* The Commonwealth is not in possession of the slightest evidence that he was *even near* where the crime was committed at the time it was committed. I mention that to you because in determining what are the true facts in this case you have before you statements of this defendant, one of the *two witnesses* to what took place, and if he lied about Phillips you have a right to ask yourselves whether he lied about Bryant. Was he an innocent bystander or was he a participant in this brutality? Was he the man who beat and beat and beat the poor dead man until he passed out of this life, or was he the man who stood in between the doorway of the two rooms? . . . So, what is the truth? That is what you must ascertain. The law says that all of those who participate in a robbery and other crimes that are enumerated in the Act of Assembly are equally guilty. . . . If A and B are together and A fires the shot, B is just as guilty if he participates in one of these enumerated felonies as though he fired the shot himself. . . . If you believe this defendant is guilty of murder in the first degree, then decide whether it should be life imprisonment or death in the electric chair."

It is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony. While the main purpose of a judge is to state and explain the law and briefly review the evidence, it is always the privilege and sometimes the duty of a trial judge to express his own opinion, including his opinion of the weight and effect of the evidence or its points of strength and weakness or even the guilt or innocence of the defendant and the verdict which, in his judgment, the jury should render, provided (1) there is reasonable ground for any statement he may make; and (2) he clearly leaves to the jury the right to decide all the facts and every question involved in the case, regardless of any opinion of the court thereon: *Commonwealth v. Cunningham,* 232 Pa. 609, 611, 81 A. 711; *Commonwealth v. Foster,* 364 Pa. 288, 293, 72 A. 2d 279; *Commonwealth v. Simmons,* 361 Pa. 391, 407, 65 A. 2d 353; *Commonwealth v. Watts,* 358 Pa. 92, 97, 56 A. 2d 81; *Commonwealth v. Jones,* 341 Pa. 541, 551, 19 A. 2d 389; *Commonwealth v. Nafus,* 303 Pa. 418, 420-1, 154 A. 485.

The question in the instant case is whether the judge in his charge to the jury, *by treating controversial questions as established facts,* took away from the jury their right to pass upon and decide the evidence and issues presented to them, particularly with reference to Phillips? We are of the opinion that the trial judge unintentionally usurped the power of the jury and for this reason, the appeal must be sustained.

Our conclusion is further supported by *Commonwealth v. Light,* 195 Pa. 220, 45 A. 933. The defendant in that case was indicted for larceny. We there said: "This part of the charge is however open to the objection that *it states as an established fact in the case a matter which was the subject of the most serious controversy at the trial,* and upon which the guilt or in-

nocence of the defendant in the minds of the jury would depend to a great extent. Whether the defendant Light assisted in taking the turkeys to the buggy was the most important question in the case in determining his guilt. If he assisted in this act, his conduct at the time, shown by the same testimony, together with his denial, and his fabrication of an entirely different account of the matter left little room for doubt. If, as he testified, the turkeys were placed in the buggy by Sholl during his absence and without his knowledge, the case against him was much weakened. The statement that if '. . . at any time between the time they took these turkeys to the buggy,' etc., *was an assumption by the court of a fact which had not been established by testimony.* This was certainly injurious to the defendant. To what extent it prejudiced his case it is impossible to say. It is enough that it may have done so."

The statement of the court during the trial that "Phillips is out. . . . What happened after Phillips is eliminated?"; together with the court's charge exonerating Phillips and stating that he was an innocent man—who had successfully established an alibi and been vindicated in the community and was not *even near* (he was within half a block one hour before the murder, according to his own testimony) the scene of the crime at the time of its commission—assumed as established and true facts, facts which had not been proved and were, at best, important controversial questions which only the jury and not the judge could decide.

Judgment reversed and a new trial granted.