Keating, Appellant, *v.* Belcher.

Argued December 1, 1955. Before STERN, C. J., STEARNE, JONES, BELL, and MUSMANNO, JJ.

*Nochem S. Winnet,* with him *Charles M. Solomon* and *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*Thomas Raeburn White, Jr.,* with him *White, Williams & Scott,* for appellee.

OPINION BY MR. JUSTICE BELL, January 12, 1956:

Plaintiff sued in trespass to recover for the very severe injuries he received in a collision between a motorcycle on which he was a passenger, and an automobile operated by Harold Crew, who is not and never was a party to this action. The jury returned a verdict in favor of the defendant, the Court below refused to grant a new trial, and the plaintiff thereupon took this appeal.

Jensen, the driver of the motorcycle, was driving in a northerly direction on Limekiln Pike in Upper Dublin Township, Montgomery County. The Pike at the point where the accident occurred was straight for three-quarters of a mile. The road varied in width from 18 to 21 feet and was divided by a white line in the center. Jensen's motorcycle was following defendant's automobile, which was on the proper side, namely, the right hand side of the road, and proceeding north on Limekiln Pike. Plaintiff testified that Jensen blew his horn to signify his intention of passing defendant, who was driving about 40 miles an hour; that defendant then

waved to Jensen to come by; that when Jensen was five or six feet to the rear of defendant's car and had pulled out to pass, defendant's car drifted to its left—although still remaining on his own side of the road—thus causing a collision between some part of the motorcycle and the left rear fender of defendant's automobile, as a result of which the motorcycle collided with the left side of Crew's car coming in the opposite direction. Crew's car was on his proper side of the road.

Defendant and a passenger in the south bound automobile (Crew's car) denied that defendant's car swerved in any manner. The driver of Crew's car testified on behalf of the plaintiff, but did not materially aid plaintiff's case. Defendant denied that he ever waved his hand or signaled to Jensen to pass him, although at best for plaintiff this would be an invitation to pass when safe, and not a command to pass or an all-clear signal. Cf. *Lewis v. Quinn*, 376 Pa. 109, 113, 101 A. 2d 382. Defendant further testified that the motorcycle was behind him and not alongside of his car when it ran into Crew's car.

Plaintiff's testimony at the trial differed substantially from the signed statement he gave a police officer at the hospital after the accident. The signed statement, incidentally, made no reference to any waving of the hand or similar signal by the defendant nor was any such signal seen by any other witness. Plaintiff at the trial denied knowledge of his signed statement and also denied his signature thereto. It is clear from the verdict that the jury must have believed defendant and the witnesses who testified in his favor. The negligence of Jensen, the driver of the motorcycle, was so obvious and flagrant, and the negligence of the defendant so doubtful or non-existent, that it is clear that the jury brought in the only verdict which it *justly* could have rendered.

Appellant makes the oft heard complaint that the trial Judge was unfair and was prejudiced against his case, and that the testimony of the other side was emphasized in the Court's charge, while his case or the testimony of his witnesses was lightly or sketchily or disparagingly treated, and consequently he was denied a fair trial. Everyone in the Commonwealth of Pennsylvania is of course entitled to a fair and impartial trial, but that does not mean that a trial Judge must be "a mere moderator": *Welsbach v. Phila.*, 318 Pa. 166, 170, 178 A. 126. A Courtroom is a Court of Justice and not just a battleground for the tilting of attorneys or a testing of their wits and oratory—to so limit it would often jeopardize or defeat Justice. Judges should, within reasonable limitations, allow attorneys to try their own cases; they should refrain from extended examination of witnesses; they should not unnecessarily interrupt or rudely treat witnesses or counsel; and they should not, *unless the facts of the particular case and the interest of Justice warrant it,* express an opinion on the merits of the case or the witnesses' credibility; and if they do so they must clearly explain to the jury that the facts and the credibility of the witnesses and the truth or falsity of their testimony is a matter solely for the jury. The Judge should also bear in mind that undue interference with the trial of a case and *undue* emphasis of one side of the case or intemperate treatment of witnesses or counsel are not in the interest of Justice. Cf. *Commonwealth v. Myma*, 278 Pa. 505, 123 A. 486; *Welsbach v. Phila.*, 318 Pa., supra. However, it is equally true that the facts in a particular case and the interest of Justice, which is paramount, may justify and sometimes may require a trial Judge to express his opinion of the credibility of witnesses or of the implausible story they fabricate or tell, and in such circumstances he is privileged to do so—provided there is rea-

sonable ground for his comments and he clearly and unquestionably impresses on the jury that it is their understanding and recollection of the facts and their judgment of the witnesses' testimony and the witnesses' credibility which prevails.

In *Commonwealth v. Patskin*, 372 Pa. 402, 421, 93 A. 2d 704, we said: "In Commonwealth v. Chambers, 367 Pa. 159, 79 A. 2d 201, this Court said, (page 164): 'It is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony. While the main purpose of a judge is to state and explain the law and briefly review the evidence, it is always the privilege and sometimes the duty of a trial judge to express his own opinion, including his opinion of the weight and effect of the evidence or its points of strength and weakness or even the guilt or innocence of the defendant and the verdict which, in his judgment, the jury should render, provided (1) there is reasonable ground for any statement he may make; and (2) he clearly leaves to the jury the right to decide all the facts and every question involved in the case, regardless of any opinion of the court thereon: Commonwealth v. Cunningham, 232 Pa. 609, 611, 81 A. 711; Commonwealth v. Foster, 364 Pa. 288, 293, 72 A. 2d 279; Commonwealth v. Simmons, 361 Pa. 391, 407, 65 A. 2d 353; Commonwealth v. Watts, 358 Pa. 92, 97, 56 A. 2d 81; Commonwealth v. Jones, 341 Pa. 541, 551, 19 A. 2d 389; Commonwealth v. Nafus, 303 Pa. 418, 420-1, 154 A. 485.'" *Commonwealth v. Chambers*, 367 Pa., supra, was also quoted with approval in *Commonwealth v. Kloiber*, 378 Pa. 412, 416, 106 A. 2d 820, and in *Commonwealth v. Lance*, 381 Pa. 293, 297, 113 A. 2d 290.

While the aforesaid rule was laid down in murder cases, it is equally applicable in civil cases where money

instead of a man's life is involved. However, the trial Judge's right to express his own opinion should be exercised, we repeat, only when the facts warrant it and Justice will thereby be aided. Moreover "Judges should never forget that 'the first and most essential element in a jury trial is a wise, learned, impartial and competent judge.' ": *DiBona v. P.T.C.*, 356 Pa. 204, 216, 51 A. 2d 768.

From a reading of the bare record, we cannot say that the trial Court committed reversible error either in the conduct of the trial or in its charge to the jury.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In all my 20 years as a trial judge, 10 years as a trial lawyer, and 4 years on the appellate bench, I doubt that I ever heard or read a more effective speech for the defendant in a negligence case than the one which appears in the record in the case at bar—the one delivered by the Honorable JOSEPH L. KUN of the Court of Common Pleas of Philadelphia County. The speech is a masterpiece in its partisan appeal under the guise of juristic logic, in its call for a unilateral verdict in the name of impartiality, and its appeal to a single track of thinking over a double track of argumentation.

From the moment that the plaintiff, Frank Keating, hobbled into Judge KUN's courtroom on his crutches he had no more chance of gaining a verdict than he has of ever seeing his shortened leg re-grow to its pre-accident length. I will direct attention first to the Judge's charge and then take up his attitude throughout the trial which reflected a bias against the plaintiff's case which was as obvious as it was unjust and as intransigent as it was uncalled-for.

The facts of the lawsuit briefly are as follows: On October 6, 1951, the plaintiff Keating was a passenger on a motorcycle being operated by Edward Jensen in a northwardly direction on Limekiln Pike in Upper Dublin Township, Montgomery County, at a speed of about 40 to 45 miles per hour. On the same highway, and at a similar speed, proceeding in the same direction ahead of the motorcycle, the defendant William H. Belcher was driving a Packard automobile. Intending to pass the automobile, Jensen twice sounded his horn, whereupon, according to Keating, Belcher waved to Jensen to come ahead. Jensen denied that he so waved. What actually happened at the exact time of the accident became the issue of fact at the trial. The plaintiff contended that at the moment Jensen began to pass Belcher, Belcher turned to the left, the left rear of his car coming into contact with the front of the motorcycle which lost balance and was struck by another car (a Buick) coming from the opposite direction. As the result of the collision Jensen was killed and the plaintiff sustained grave injuries whose harrowing details need not be described here. The defendant, as indicated above, denied that he motioned Jensen to come ahead and he testified also that he was entirely unaware of the motorcycle behind him until he heard a crash and saw the motorcycle and two persons flying through the air.

The resulting factual issue was a simple one. The plaintiff maintained that the defendant, without warning, swerved to the left into the motorcycle's path after he had invited the motorcycle to proceed forward. The defendant insisted that he did not move into the motorcycle's way, but that presumably the motorcycle driver carelessly ran into the rear of his car. If the accident happened as described by the plaintiff, he was entitled to a verdict; if it happened as the defendant narrated

it, the defendant was due the verdict. According to the Judge's charge, however, the jury was to reject the plaintiff's claim, regardless of the contentions of the respective parties.

The purpose of a judge's instruction is to enlighten the jury on the law applicable to the facts as ascertained by them. But a reading of the record before us reveals that the Judge's charge bears no resemblance to a measured, calm recital of facts and a reflective application of pertinent law to those facts. The charge was not a judicial pronouncement. It was a speech, an argument, a ringing appeal for vindication of the defendant. Although it sought to explain away every item of culpability which the evidence directed toward the defendant, it took up the plaintiff's case point by point and replied to each with the all-annihilating condemnation of an advocate.

If the jury had accepted the speaker as a partisan they might still have regarded themselves free to reach a finding in consonance with their untrammeled judgment. But the speaker was not standing at the jury box rail as a lawyer, he was exhorting, in black robes, from the bench—as the voice of the law. And that voice made it clear from the very beginning—as the jury was compelled to appraise the picture—that the law was sounding a death knell to the claims of the plaintiff: "You must understand the duties that you have to perform as jurors. *You are not here to be moved by any emotional approach or suggestion or because, some person appears before you on crutches* or because as might happen in another case some person was killed somehow or other in an accident of some kind. They are not the things that decide cases at all." *

* All italics, mine.

The Judge here was wrong. While crutches do not, of course, decide cases, they are part of the case if the plaintiff is required to use them as a result of a violent act which is the subject of the lawsuit, and they are not to be made the target for sarcasm and sneers, especially by the trial judge.

The Judge went on: ". . . because a person who has been sued was involved in some way in an accident does not necessarily mean that he is responsible in damages to the person who was injured. It is very important for the jury to understand that fundamentally. The basis of liability is proof satisfactory to the jury, and by the weight of the evidence, the preponderance of the evidence—*mark these qualifications*—that the defendant committed a wrong of some kind, the wrong in this situation being the negligence alleged, negligence being defined simply as the want or absence of due care under the circumstances."

It will be observed that at the very outset of the instructions to the jury, the Judge is conditioning the minds of the jurors to be on guard against the plaintiff: *"Unless that is proven,* namely, that the defendant in this case in some way failed in a duty to his fellow man, *unless it is proven* to your satisfaction that he failed in that duty, failed to use reasonable care, that he did something a prudent person would not do, then *there is no basis here for a verdict for the plaintiff and it does not make any difference how badly he was injured. . .* That is what you have to keep your mind's eye on, you see, and you have to listen patiently to evidence, testimony, that is produced, which you have done, the witnesses have to be evaluated by you, you have to determine whether they are telling what happened or *inventing something or creating something to make a point. . . ."*

While the Judge here is using general language he is obviously directing himself to the plaintiff's case and is suggesting the possibility of "invented" testimony although there is no dark crevice in the whole trial from which could emerge so insidious a suspicion. But in the *defendant's* conduct the Judge perceives only unimpeachable correctness: "The main and almost exclusive duty of a person who is driving an automobile is to keep his eyes ahead of him. As a matter of fact, a person fails in his duty of operating an automobile if he does not keep his eyes ahead of him. He has to know where he is going, he has to look and see what is going on in front of him, and it is only in a rare kind of case that a person driving a car can be responsible for something that happens in back of him, because his duty, naturally, is to see where he is going and what conditions are ahead of him."

Since the defendant had predicated his whole defense on his assertion that he was looking ahead and did not see the motorcycle behind him, the Judge, by the statement just quoted, made of the defendant's assertion not only proof of non-negligence but a demonstration of virtue and fulfillment of duty. But it is not true that the defendant could exculpate himself from the charge of negligence by the simple remark that he looked ahead. What the Judge should have added at this point was that while the defendant must look ahead, there is a duty devolving upon him also, through the use of his rear mirror, to ascertain if anyone is endeavoring to pass him from behind, especially when some one sounds a signal from behind. The Judge neglected here, in addition, as indeed he did throughout the charge, to point out that while the car operator must keep the road ahead in his vision, he must also keep his car in the lane in which he is travelling unless he gives suitable warning to those immediately to the

rear that he intends to enter into another lane. The Judge apparently did not regard it appropriate here, as he did when discussing the plaintiff's case, to tell the jury to "mark these qualifications."

After lauding the defendant for looking ahead, the Judge then proceeded to erect insuperable road blocks in the path of the plaintiff. He piled up a barricade of "ifs" which the jury could not possibly surmount, even if satisfied that the plaintiff deserved a verdict: "Of course it is a correct statement of the law to state that *if*—that is always a question in the case you are trying, *'If'* capital *'I'* and capital *'F'*—*if* a man is driving along in an automobile in the usual way and he is informed by notice or otherwise of the fact that a car or a motorcycle is passing him, is alongside of him in the act of passing him, you see, he has to allow him to pass, and *if* he, through inattention or otherwise, makes a sudden turn, you know, in the path of the vehicle attempting to pass him, he can be held responsible. That is the big *'if'* in the case. . ."

Over twenty times the Judge planted a formidable "if" in his charge as a barrier which the jury had to overcome in order to reach a decision for the plaintiff. On two occasions the Judge added granitic superstructure to the "if" by announcing that when he said "if" he did not mean an ordinary "if." He had in mind an "if" with a capital "I" and a capital "F." But he never constructed a capital IF in the way of the defendant.

Four days after the accident a police officer questioned the plaintiff at the hospital to which he had been borne by ambulance. At the trial the plaintiff repudiated some of the averments attributed to him in the statement prepared by the police officer. On this the Judge charged: "When it is suggested to a jury that a statement is not the statement of the man whose state-

ment it is alleged to be, you have to decide whether there is any basis for supposing that the man who presents it, in this case an officer of the law, invented the statement. Of course an officer of the law has no ax to grind with anyone; he is just there to get information."

Whether the officer had or had not an ax to grind was not developed in the case and the Judge was something less than correct by arbitrarily assuming that the officer's testimony was sacrosanct. Dealing with human beings and being a human being, an officer is not beyond the weaknesses of a human being. Furthermore, it was possible that the officer honestly and innocently misunderstood what the plaintiff said, and it is also possible that the plaintiff himself erred in some detail of recollection. The horror of the accident was still upon him, he was trussed up in a painful cast, and he was under the influence of many medicines. The jury should have here been instructed to reconcile the conflicting testimony if possible and, if not, decide, using the standards of credibility, which witness more correctly recalled what was said. Instead, and without justification, the Judge placed his imprimatur on the officer's unimpeachability and, in effect, branded the plaintiff a liar.

We have indicated that it was the plaintiff's testimony that the defendant's car suddenly turned to the left. The Judge attempted to explain away this accusative evidence by saying that on a country road "there is a certain amount of drifting and swaying in the mere operation of a car—no car runs on a rail so that it cannot move one way or the other. The wheels, as you know, always have a certain amount of shake in them depending on the kind of road it is, and even with normal driving there is a certain amount of deviation."

The plaintiff had never said that the defendant's car swayed or swerved to the wrong side of the road. He

said that it had swerved over to the left, enough to block the passage of the motorcycle. But the Judge in his charge made it seem that this was a concession wrung from the plaintiff: "It may be said incidentally that it was *conceded* by the plaintiff here and corroborated by the man called this morning that the defendant was always on his right side of the road, was always where he was supposed to be in general, you know. I am not speaking now about any possible deviation, but he was always on the right side of the road; he never got over the center line, *you see.*"

In addition to the wheedling "you see", the Judge stated that the plaintiff had *conceded* something. Evidently he regarded himself, as indeed he was, an opponent of the plaintiff's, because one only concedes to an adversary. One does not concede to a judge, to an arbiter, or to an impartial overseer. The Judge liked this idea of a concession so much that later he repeated it, adding the debater's classic touch of "mark you."— "The plaintiff is asserting the right to recover on the ground that the defendant knew that this cycle was passing his automobile, he had knowledge, etc., etc. . . . that he was travelling in the path of the motorcycle, though never getting away from his side of the road, *as it was conceded, mark you.*"

We will recall that the plaintiff said that the defendant had waved the motorcycle on. This was a most important piece of evidence in behalf of the plaintiff's cause. The Judge set out to demolish it. First he explained that the defendant had denied waving, and then he lifted an oratorical sword to defend the defendant's denial: "It seems to me that you have a very strong piece of evidence to help you to determine the validity of that statement because, since the Buick car was there, you see, because the crash took place with that car, the question put to you is, *is it reasonable to*

*suppose that the man* driving the Packard going north would wave to someone to pass him when the other car, the Buick, was right about on top of him? You see, that is an argument that is put to you which you can dispose of according to your own good sense and judgment."

This could well have been a legitimate argument for defendant's counsel to make, but was it the Judge's function to make it? Moreover, it was a meretricious one. There was no evidence that when the Defendant waved the motorcycle on, the Buick was in view; there was no evidence that the plaintiff said that the defendant waved subsequent to the Buick's arrival; and there was no evidence that the defendant was a perfect driver, doing exactly what he was supposed to do and omitting what he was not supposed to do. In fact, his competence as a driver was the very issue in the case— until the Judge sheathed him with armor plate of indisputability, infallibility, and invincibility.

The Judge now turned his guns on the statement of the plaintiff that the motorcycle had drawn up alongside the rear of the defendant's car. The Judge rhetorically asked: "Was it alongside the car?" And then, having set up the target, he proceeded to fire (but not with ammunition tested in the laboratory of comparative logic): "On that point the most revealing testimony in the case, it seems to me, came this morning from the driver of the Buick car, and *he was in the most perfect position* to see what was coming toward him. Obviously so, because he was going south and the other car, the Packard, was going north, just as the cycle was. I mean the witness was right there looking at it. Whatever happened or was going to happen was right there before his eyes."

But who said that he was in the "most perfect position?" He was in no better position than the plaintiff

who also had the whole situation before his eyes. It was for the jury to decide who had the better position and not for the Judge to apply the superlative in a matter of evidential dispute.

Although the driver of the Buick was, according to the Judge, in the most perfect position to testify to what happened, this driver did not deny that the defendant had put out his hand to wave the motorcycle driver to come ahead. With the alchemy of bias, however, the Judge transformed this piece of evidence which favored the plaintiff into a point for the defendant by saying that plaintiff's counsel failed to ask the driver a question about the hand-waving. But defendant's counsel also did not ask that question. When prejudice rules the kitchen, the sauce for the goose is apparently not the same sauce supplied for the gander.

The defendant brought on a witness from Georgia to testify. In the eyes of the Judge, the dust of the journey added a special coat of credibility to this traveller's testimony: "He [the witness] was brought up all the way from Georgia for the purpose of testifying. You have to consider whether a person who didn't know anything about it or who said he did not see anything would be brought all the way up from Georgia to testify."

There could have been many reasons, apart from any desire to tell the truth, why one would come up from Georgia to testify. This particular witness happened to be in the army and he might well have enjoyed the opportunity to get home with all expenses paid. Nor is there anything to establish that his powers of recollection or even reliability surpassed those of the plaintiff who testified contrary to what the Georgian traveller said.

When the Judge got to the question of damages, on which he was compelled to charge no matter how re-

luctantly, he began by speaking of "fantastic injuries": "In some cases the question of the extent of injury and the amount of damages suffered is very sharply litigated, sometimes even more than the first part of the case, because people come in and claim all sorts of fantastic injuries and results, *you know.*"

Why did the Judge say to the jury: "You know"? There was no evidence that the jury knew of "fantastic injuries." Was this statement of the Judge a subtle maneuver to further prejudice the jury against the plaintiff? Whatever the purpose behind it, the statement was offensively gratuitous. What may have happened in other cases had nothing to do with the current case.

The Judge never allowed the jury to lose sight of the fact that from his point of view the possibility that the plaintiff was deserving of damages was quite remote. Hence: "Therefore, you will determine the amount of the verdict . . . *if* you render a verdict for the plaintiff, *of course.*"

When a defendant in a negligence case, after a proper trial, is required to pay damages, the law regards this as simple justice, but in the eyes of the Judge the payment of any damages by the defendant was a *saddling* of injustice: "Now, whatever pain, suffering and inconvenience you think that involves—and I suggest it involved a good bit—should be compensated for, *if* it is to be *saddled* on *this defendant.*"

In further protection of the defendant, the Judge now fired several salvos of "Ifs": "Of course, that is the thing about the case. You have to first figure that out, but *if* it is to be charged to the defendant, *if* the accident was his fault, *if* negligence on the part of the defendant resulted in all this, then the defendant has to pay the damages."

The Judge apparently feared to risk the jury's determination on a general bombardment of "ifs"—even if capital "IF's". Thus, he felt constrained to repeat the admonitory "if" after each item of damage he was compelled to mention. Hence, after referring to the hospital bill of $4,404 and the doctors' bills of $1,085, he hastened to add that this was a "recoverable item *if* the plaintiff is entitled to recover, *of course*." After taking up the item of loss of wages he hammered home: "*if* you come to that part of the case, *of course*."

Then when he finally reached the end of the whole unpleasant discussion of damages he made it thunderously evident that he did not approve of the plaintiff's getting any damages at all. Accordingly, he unlimbered his heaviest artillery of "Ifs": "It is those items that I have referred to that are to be considered by you, properly so, as bases for damages *if* you conclude that the defendant who was brought in and sued in this case was responsible for all this. *That is the thing* and that is where the capital "I" and the capital "F" come in, as I said earlier in the charge, because *that is the big thing* in every case. The case turns on it."

Even after completing his charge, the Judge detonated still another "if," varying the monotony of the "ifs" by referring to this one as a "chief 'if.' " When plaintiff's counsel asked him to read a point, which the Judge did, he remarked: "I thought I made that very clear to the jury. That is the *chief 'if'* in the case."

Plaintiff counsel indicated in his brief that the Trial Judge reenforced his oral argument with gestures, menacing attitude, dramatic facial expression, and inflection of voice. Not having a talking picture reproduction of the charge we do not know whether counsel's description objectively mirrored the Judge's actions. But it would appear from reading the charge and in noting the aggressive manner in which the Judge

146

participated in the trial itself, that it would not be difficult to picture the learned Judge accompanying his vigorous language with appropriate histrionic effects.

I have no hesitancy in saying that Judge KUN'S biases, prejudices, hyperbolic criticisms and unwarranted condemnations turned the plaintiff out of court and wrote in the history of the judiciary a page which can only be read with considerable embarrassment and contemplated with unmedicinable regret.

In the case of *Commonwealth v. Claiborne*, 175 Pa. Superior Ct. 42, 50, the Superior Court, speaking through the able and veteran Judge RENO, emphasized, quoting from *Com. v. Myma*, 278 Pa. 505, 508: " 'The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table. To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence. Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them.' "

In the case at bar Judge KUN was impervious to all the admonitions laid down by the Superior Court in the Claiborne case, which admonitions, incidentally, were propounded for his special benefit because it was

due to his conduct in that case that a new trial was ordered.

Judge KUN has also already been rebuked by the Supreme Court for his attitude and demeanor during trials. In the case of *DiBona v. P.T.C.*, 356 Pa. 204, 215, his favoritism toward the defendant in a negligence action and his aversion to the plaintiff's case, combined with hostility toward plaintiff's counsel, caused this Court to use exceptional language in reprimand. Speaking for the Court, Mr. Chief Justice MAXEY said: "This record discloses that this trial was not a fair one. In addition to asking Miss Lyle the improper question discussed on page 207, the judge [Judge KUN] in other instances *exhibited favoritism to the defendant and hostility to plaintiff's case and counsel.* For example, he asked Miss Lyle this leading question: 'After the accident happened the bus stopped almost instantly, did it?' When she replied 'Yes', he said, 'That is an important point.' A trial judge should not ask a witness, especially a child, such a leading question. Furthermore, whether the bus 'stopped almost instantly' might or might not be 'an important point' as showing its speed when it approached its victim."

Also (p. 216): "An example of the trial judge's unfairness appears when as Miss Lyle was being cross-examined, plaintiff's counsel said, 'I think she is confused'. The judge then said: 'Look here, I don't want you to interrupt this child again by stating that people are confused. I will not tolerate that, Mr. Horan.' There was nothing in the conduct of plaintiff's counsel which invited such a rebuke. Plaintiff's counsel then said: 'I don't think that Mr. Baile had made it clear, sir.' The judge replied: 'That is not the way to conduct a trial—interrupting like that. You can always ask a witness later on to clarify anything you want. Do not interrupt and interject comments like that. It is not

right.' One of the plaintiff's witnesses answered a question by saying, 'From a witness at the scene we learned that a pedestrian—'. The trial judge said: 'You cannot tell what you learned from a witness. You should know that by this time.' At another point in the trial the judge said to plaintiff's counsel: 'Look here, have you tried cases before me before?' Counsel answered: 'I think I have, your Honor.' The trial judge then said: 'Let me instruct you. When I, make a ruling, do not argue the point, take an exception.' The rebukes thus administered by the trial judge were uncalled for and were made in ill-chosen language. Judges should never forget that 'the first and most essential element in a jury trial is a wise, learned, impartial and competent judge.'. . . A litigant who is denied this 'essential element' is deprived of 'due process of law.' "

Under the reasoning in the above quoted-from case I can only conclude that Frank Keating here was deprived of due process of law.

Unless this Court shows by suitable action that it will not tolerate the kind of judicial tyranny conspicuously demonstrated in the case at hand, the legal profession may come to the conclusion that the Supreme Court regards this type of petty despotism as of trifling consequence, whereas, in point of geological reality, it strikes at the very foundation of faith in our whole judicial system.

Judge KUN's treatment of the distinguished attorney who represented the plaintiff was reprehensible and inexcusable. Aside from the fact that a lawyer possesses feelings and is entitled to respect from the Court which he respects, disparagement of counsel during a trial strikes directly at the party litigant. It is a matter of common observation that the jury regards the lawyer as a personification of his client's cause. Thus every fulmination hurled at the attorney becomes

a grenade exploding against his client. This Opinion would be extended to an inordinate length if I were to cull from the record every instance of Judge KUN'S improper, unjust and unfair treatment of former Judge WINNET representing the plaintiff. One or two illustrations will suffice.

I have already mentioned that a dispute arose during the trial as to the accuracy of the statement taken from the plaintiff following the accident. MR. WINNET very properly desired that the jury know that the plaintiff had been questioned in the hospital while he was suffering from his multiple and serious injuries. The Judge apparently was loth to see this fact emphasized. The following occurred: "MR. WINNET: If your Honor please, this [the statement] was taken four days later in the hospital. THE COURT: *We don't care about where it was taken.* The circumstances under which it was taken can be developed later. The question right now is whether that is his signature to the statement. That is all that is involved at the moment. MR. WINNET: May I see the original statement there, your Honor? THE COURT: There it is. You better show it to him again and call him to the bar of the Court again. MR. WINNET: Remember this was taken in the hospital. THE COURT: *I don't care where it was taken.* Don't *repeat that again.* Certainly, it was taken at the hospital. That is where they had to go to get the statement. The man was in the hospital at the time. *That has nothing to do with it.* Show the plaintiff his signature to the complaint which was filed in this suit. And then you will please look at the statement which is shown to you, *allegedly* signed by you at the hospital, taken by the local police who went there for the purpose of trying to find out what happened. And now after looking at them you may state whether or not you signed this statement which has been shown to you, whether that is your

150

signature or not. (No response). The Court: Can you answer that question, Mr. Keating? The Witness: Your Honor, I still don't think it is my signature. Mr. Winnet: Your Honor, if the statement was taken from the man in the hospital and the man was there, I am perfectly willing— The Court: I told you before not to state that at this point. *It is improper, very improper.* Go ahead with the examination and then call in the man who took the statement."

Judge Kun's characterization of Mr. Winnet's conduct as "improper, very improper" was improper in itself and was bound to work to the serious disadvantage of the plaintiff, Frank Keating.

In questioning Keating about his injuries and the pathological effects of those injuries, Mr. Winnet asked whether he had suffered delusions. The Judge interrupted: "The Court: Does a person know when he has delusions? Can you ask a person that question? That has to be proven otherwise. When is it proper to ask the person himself, 'Are you suffering from delusions?' Mr. Winnet: When, your Honor? When? The Court: How does he know? Mr. Winnet: He does know, your Honor, because he has had treatment. The Court: He cannot know that. Mr. Winnet: He was in the hospital. The Court: He cannot know that. From the very fact it is called a delusion means he doesn't know about it. Mr. Winnet: Your Honor, he may have had treatment for it while he was in the hospital. The Court: Having treatment for a thing does not mean he suffers from it, not at all. It is a non sequitur. However, we will come to that at the proper time. In presenting his case to the jury he made no mention of anything like that. Mr. Winnet: No, because we didn't stand on it, your Honor. However, it was brought out— The Court: It was not brought out properly. Mr. Winnet: I want to ask him now if he

knows at what period did he have delusions after the accident. THE COURT: He would not know that. It is an improper question."

The Judge here was triply improper. He was unjudicially contentious, he unfairly criticized plaintiff's counsel, and he was tenaciously inaccurate on a scientific fact. It is not true that a former mental patient may not relate what he has experienced. There are many books written by persons who, having been in hospitals for the mentally ill, have well described their symptoms, treatments, and cures.

The Judge's animadversions against counsel were only reflective of his attitude toward the whole plaintiff's case, which he apparently was ready at any moment to condemn, disparage and belittle. When MR. WINNET asked the plaintiff how far the defendant's car had gone to the right, the Court broke in with a scoffing observation: "The Court: *Don't draw on your imagination.* If you can answer these questions honestly, say so, *but don't try to draw on your imagination.* If you can conscientiously answer the questions, do so, but if you cannot, don't do it. This was all in fast motion, you see."

Prompt as the Judge was to reprehend the plaintiff and scorn his case, he was equally eager to support and bolster the defendant's case, even to the extent of giving observations which almost amounted to testifying from the bench. Since the whole issue in the trial was whether the defendant swerved his car into the path of the motorcycle or whether it swayed or drifted to the side, the Judge repeated several times that the car was not confined to a track: "The Court: Well, you have to be sure. You have to remember the words. You know, an automobile does not run on a track and there is a certain amount of weaving, you know, whoever is driving. It cannot be helped. Anyway, that is the way

he described it, that when they gave him the horn and all that, the car drifted a little to the right, and then his impression was that it drifted to the left a little."

. . . "The Court: As we remarked before, neither the car nor the motorcycle were on a rail. They were in motion and there is a certain amount of side motion, naturally, all the time. . . By the Court: Q. You know that, don't you? A. Yes, your Honor. Q. It is not on a fixed rail. That applies not only to the automobile, but to the motorcycle. But, naturally, in trying to pass, whether it is an automobile or a motorcycle or whatever it is, you have to give yourself enough room to pass."

Of course, it was inevitable that the jury would return a verdict for the defendant. Since the Judge made the last speech and there was no one to reply to the inaccuracies and irrationalizations in his summation, the jury accepted his version of what constituted truth and justice and returned the verdict he so obviously sought. In refusing the plaintiff's motion for a new trial, Judge KUN uncloaked his prejudice against the plaintiff by the very first sentence of his Opinion: "The plaintiff presented a rather extraordinary claim."

The Judge said further: "As we have indicated, this was an unusual kind of claim, and what plaintiff really complains about is that the Trial Judge took too much caution by reminding the jury too frequently that their basic responsibility was to determine whether the defendant had been negligent. This approach to the conduct of the case is, it appears to us, necessary when there is a case of very severe injuries resulting from an unusual kind of occurrence, in which the basis for a defendant's liability is rather nebulous, as in this case."

Whether the defendant's liability was "nebulous" was never really determined because the jury was so intimidated, coerced and practically bludgeoned into

their verdict that no conclusion can be based on their decision alone. The jury had no choice in returning the verdict they did without actually rebelling against the man who, wearing the indicia of absolute authority, became their master and dictated their judgment.

I most vigorously dissent.