Commonwealth *v.* Young, Appellant.

Argued April 20, 1965.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Louis Lipschitz,* with him *Morton Gorelick,* for ap-
pellant.

*Joseph M. Smith,* Assistant District Attorney, with
him *Myrna P. Field,* Assistant District Attorney, *F.
Emmett Fitzpatrick, Jr.,* First Assistant District At-
torney, and *James C. Crumlish, Jr.,* District Attorney,
for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 30, 1965:
On November 16, 1962, Thomas Young, the appel-
lant, was convicted by a jury in Philadelphia County

of murder in the first degree and punishment was fixed at life imprisonment. Motions in arrest of judgment and for a new trial were denied by a majority of the court en banc. After sentence was imposed in accordance with the jury's verdict, an appeal from the judgment was entered here.

The motion in arrest of judgment was not pressed at oral argument or in the printed brief. We will, therefore, limit our consideration and discussion to the motion for a new trial. It is our considered conclusion that two of the assignments of error must be sustained and a new trial granted. We will, therefore, reverse the judgment.

For purposes of impeaching the credibility of Young's trial testimony, the Commonwealth, in rebuttal, identified a record purporting to show his prior conviction of the crime of robbery in another county. This evidence was introduced through the testimony of the clerk of courts of said county who produced files from his office, consisting of a transcript, an indictment dated January 14, 1952, and a guilty plea thereto by "Thomas Young", a male, colored man who was then 19 years of age. Not another iota of evidence was introduced to show that the Thomas Young involved was the same individual then on trial.

The Commonwealth's position, sustained by the court below, was that the identity of names, in the absence of contradiction,[1] was sufficient in itself to support a finding by the jury that the Thomas Young convicted in 1952 was the same individual on trial. To this, we cannot subscribe.

The importance of evidence establishing prior convictions of serious crimes for impeachment purposes cannot be overemphasized. It can, and often does, de-

---

[1] The defendant did not take the stand in surrebuttal to deny he was the person involved.

stroy a witness's credibility and significantly influences the outcome of the trial. In view thereof, it appears to us that the identity of the person should be established by something more than mere similarity in name. The name Young is not uncommon; in fact, a perusal of the current Philadelphia city telephone directory manifests fifteen listings for "Thomas Young". Under the circumstances, we conclude that it was prejudicial and reversible error to permit the jury to make such an important finding on the basis of inconclusive evidence.

The Superior Court of Pennsylvania adopted our view in this respect in an analogous situation. See, *Commonwealth v. Falgiatore,* 165 Pa. Superior Ct. 235, 67 A. 2d 674 (1949). Also, in every case within our knowledge wherein this Court has approved the admission of a record of prior convictions for impeachment purposes, evidence other than the record itself was introduced to show identity. See, e.g., *Commonwealth v. Snyder,* 408 Pa. 253, 182 A. 2d 495 (1962), and *Commonwealth v. Holley,* 358 Pa. 296, 56 A. 2d 546 (1948). Moreover, while concordance of names is always evidence of identity, and in some instances sufficient in itself to cast upon the other party the duty of producing evidence to the contrary, a stricter rule is followed in most jurisdictions where the object is the identity of one convicted of crime. See, 9 Wigmore, Evidence §2529 (3d ed. 1940), and cases therein cited.

We also find serious error in the trial court's instruction to the jury. He charged in part, "My comment, members of the jury, *and I have a good reason for making it,* is that I think the defendant is guilty, and that it would be a miscarriage of justice to find him not guilty." (Emphasis supplied.) While the above underscored instruction was, undoubtedly, inadvertently expressed by the learned trial judge, the conse-

quences thereof are impossible of assessment and of such serious import that they cannot be ignored.

Certainly, the jury could reasonably conclude therefrom that the trial judge was in possession of facts, not disclosed by the evidence, that proved the guilt of the accused. It is established beyond argument that the guilt must be determined from the trial testimony and the court must not inject, through its charge, inferences unsupported by the evidence in the case: *Commonwealth v. Chambers,* 367 Pa. 159, 79 A. 2d 201 (1951), and *Commonwealth v. New,* 354 Pa. 188, 47 A. 2d 450 (1946). See also, *O'Toole v. Braddock Borough,* 397 Pa. 562, 155 A. 2d 848 (1959), and *Miller v. Montgomery,* 397 Pa. 94, 152 A. 2d 757 (1959). Whether the instruction under discussion influenced the jury's verdict is, of course, problematical. However, if it appears that an erroneous instruction might have been responsible for the verdict, a new trial is mandatory: *Vaughn v. Philadelphia Transportation Co.,* 417 Pa. 464, 209 A. 2d 279 (1965).

Judgment reversed and new trial ordered.

---

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

I concur in the decision of the Court, and will offer a couple of observations in the interests of the progress of the law. The defendant here, Thomas Young, was tried and convicted of murder. The facts are that he entered a hardware store in Philadelphia with a revolver in his hand. He pointed it at the proprietor, Milton Danzig, and ordered him to give him the money in the cash register. As soon as the robbery had been accomplished and Young had disappeared, Danzig went to the telephone to call the police. While telephoning, he collapsed and died a half hour later. Three medical experts testified that Danzig's death was the result of the shock and fright he sustained during the holdup.

Young did not fire the revolver, he did not strike Danzig with it, but its appearance and the manner in which he handled it was enough to kill Danzig. Because of this, Young was convicted of murder in the first degree—and properly so. If this Court will affirm, and it does so affirm, the proposition that a person may be responsible criminally for the harm he inflicts on another, even though he does not touch that other person, why should a person also not be liable in civil court in damages for injuries inflicted on another, even though there is no physical contact between the two persons?

Nothing can more diminish respect for law and confidence in the courts than some flagrant inconsistency which is obvious to the person on the street. In *Bosley v. Andrews*, 393 Pa. 161, a bull pursued Mrs. Bosley and although it did not come close enough to gore her with his horns, he did approach sufficiently to frighten her to the extent that she collapsed and suffered a heart attack. She sued the owner of the bull, but this Court held that since the bull did not actually touch her, there could be no recovery. This Court said: "The rule is long and well established in Pennsylvania that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress, unless they are accompanied by physical injury or physical impact."

Isn't it time to change that rule? If one can be held guilty of first degree murder when he does not lay a finger on his victim or touch him with any inanimate object, why shouldn't the person who so frightens another as to destroy that person's health be held liable in civil damages for his great wrong? For instance, what is the difference, in point of liability, on the part of a railroad company, between a case where a passenger is killed by a car running over him and the case where a passenger suffers a broken heart valve

as a result of the fear he experienced in expecting death as a car passed over him, but which did not touch him? Is the negligence and responsibility of the tortfeasor any less marked toward the living man than to the dead man's family when, after the throb of the overturned locomotive has ceased and the hissing of the punctured air brakes has faded away, there lie on the ground next to one another, the body of the dead passenger and the body of the living passenger, the latter unconscious, his outer body unblemished by a single scratch but his heart within him in ruins, so that when he awakens he will never again know a day of sound and joyous health?

I trust that the day will come when this Court will change its views on the responsibility of a tortfeasor in a noncontact injury as it has changed its views in the second matter discussed in the opinion of the Court here. This Court has ordered a new trial because the trial judge told the jury: "My comment, members of the jury, and I have a good reason for making it, is that I think the defendant is guilty, and *that it would be a miscarriage of justice to find him not guilty.*" (Emphasis supplied)

This is a wise and judicious decision although this Court did not hold that view in the case of *Commonwealth v. Cisneros*, 381 Pa. 447. The trial judge there also told the jury that "a verdict of not guilty would be a miscarriage of justice." I said in my dissenting opinion there: "This kind of language placed before the jury a dead end in their path of deliberation, it erected a barrier with which conscience, logic, and intelligence could not cope. This language almost suggested to the jury that they themselves might have to answer for some species of misconduct if they acquitted the defendant."

It is indeed gratifying to see that the law is progressing, even if not on all fronts simultaneously.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the grant of a new trial. However, as I noted in *Commonwealth v. Ott,* 417 Pa. 269, 274, 207 A. 2d 874, 877 (1965), I believe it is undesirable, unnecessary and unfair to allow the trial judge to inform the jury that, in his opinion, the defendant is guilty.