Katora et al. *v.* The New Jersey Zinc Company
(of Pa.), Appellant.

Argued November 12, 1934.

Before Trexler, P. J.,
Keller, Cunningham, Baldrige, Stadtfeld, Parker
and James, JJ.

*Ben Branch,* for appellant.

*Edgar Downey,* for appellee.

OPINION BY STADTFELD, J., February 1, 1935:

This is a workmen's compensation case. The referee and the board made an award in favor of claimants and on appeal to the common pleas court judgment was entered thereon. Defendant appealed. The essential facts are not in dispute.

Adam Katora worked for the defendant in its gas house at its Palmerton, Pa., plant. The gas house was of three stories. The ground floor consisted of pillars nine feet high supporting the gas producers which were on the second floor, and it was on the ground floor that the cinders were removed from the producers. On the second floor were the producers themselves, in shape being frustums of cones, and in them by combustion solid matters were turned into fuel gas, the combustion being speeded by a mixture of air and steam forced into the producers when in operation. The third floor was at the tops of these producers and here Katora met death on April 18, 1931.

The tops of the producers were in single row about twenty-four feet apart on centers. On each top were two large and six small orifices. From the largest orifice a thirty-six inch pipe carried off the gas when the producer was producing. From the second larger orifice was a pipe leading outside the building designed

to carry off the waste gases when the producer was not producing. The six smaller orifices were five or six inches across and were for cleaning the fire in the producer, as the workmen would remove the cover from one of these holes and with a bar poke down into the fire below.

The third floor of this gas house was not completely enclosed and the floor itself had cracks in it sufficiently large to enable one to look below. At this third floor and immediately outside along the south wall of the gas house was an open walkway, and an open bridge led from that walkway southwardly to a building fifty feet away. The northward end of this bridge was directly south of a point about midway between what is designated producers 25 and 26, while next to the west of No. 25 was producer No. 24.

Katora's work was to clean some of these producers. His shift on the date of his death commenced at midnight. After starting work he had cleaned one producer. Several workmen were present on this third floor engaged in similar work. At about 1:50 o'clock A. M. he had some lunch. At about 2:00 o'clock A. M. he started to clean producer No. 24. This producer, while it was in operation, then was "off the line," that is, not producing gas but ready for production. Nos. 25 and 26 to the east had dormant fires, but were not then in shape for production. Within a very few minutes after Katora had started to clean No. 24 he was seen walking southwardly toward the bridge and then was seen out on the bridge apparently looking down to see if his "buddy" was on the ground below No. 24 to remove its cinders. Those cleaning fires ascertained the presence of the "buddy" below either by looking down from the bridge or through the openings in the floor. Within five minutes after thus having been seen out on the bridge, his body was found inside the building between but somewhat south of producers 25 and

26 and about ten feet in from the bridge. No marks of violence were found on the body and no one had observed any mishap or untoward or fortuitous occurrence, or evidence thereof, except the body itself.

Fellow employees, upon discovering his body, immediately removed it into the open air outside the building and endeavored to resuscitate him by means of artificial respiration, but he failed to respond. They had him removed to the Palmerton Hospital where he was pronounced dead. A post mortem was performed on the body in the afternoon of April 18, 1931, by Dr. R. P. Batchelor, Surgeon-in-Chief of the hospital, and it was found that the blood of the deceased showed twenty per cent saturation of carbon monoxide gas. No other cause of death was found.

Dr. Batchelor, it appears, made a physical examination of the deceased a few months prior to the death of decedent and found him in good general health, and, although there were some minor complaints, which caused the taking of a blood test for syphilis, such test proved negative.

Appellant contends that there was not sufficient legally competent testimony to support the findings of the board.

The main contention is as to the effect of the medical testimony ex parte claimant to establish the cause of death.

Dr. Batchelor's testimony was to the effect that in his post mortem examination he found nothing suggestive of cause of death except encephalitis and carbon monoxide, and that he could not say that he died from encephalitis, and that he could attribute death of decedent to no other cause than carbon monoxide. He further stated that he knew where Katora worked, that he frequently had had occasion to examine men who worked at the same place, and that very frequently he had found from ten to thirty per cent, and in one case a 40% saturation of carbon monoxide.

Dr. W. R. Glenney, pathologist at the Pittsville Hospital, called on behalf of claimants, as an expert, testified that from going over the testimony and reviewing very carefully the findings of the post mortem, it seemed perfectly evident to him that the only thing that could possibly have caused the death of decedent was carbon monoxide poisoning. On cross-examination he admitted that he had to assume the death certificate showed carbon monoxide poisoning as the cause of death. It was his opinion that the pyrogallo tannic method employed in this case to determine the percentage of carbon monoxide in the blood is not reliable or accurate. To the extent that this witness depended for his conclusion on the coroner's certificate, or on the opinion of the other physician, his testimony would be objectionable. The board, however, in arriving at its conclusion, eliminated consideration of the coroner's certificate.

We believe, however, that the testimony of Dr. Batchelor, and the reasonable inferences to be drawn therefrom, are sufficient to support the finding of the board.

As stated in McCrosson v. Philadelphia Rapid Transit Co., 283 Pa. 492, 129 A. 568, "Of course, human frailty prevents absolute certainty in this class of cases." When we consider the prior condition of good health of decedent, and that the post mortem examination indicated nothing wrong in any of the organs which would support a finding as a contributing cause of death, and, as stated by Dr. Batchelor, he could attribute death of decedent to no other cause than carbon monoxide, we can not disregard this conclusion. Particularly in the medical profession, conclusions are often arrived at by the process of exclusion or elimination.

As stated in Flucker v. Carnegie Steel Co., 263 Pa. 113, 106 A. 192, "Where no facts appear indicating

anything to the contrary, it may be presumed logically that an employee at his regular place of service, during his usual working hours, is there in discharge of some duty incident to his employment; and, when the dead body of any employee is found on the premises of his employer, at or near his regular place of service, under circumstances fairly indicating an accidental death which probably occurred during the usual working hours of the deceased, the inference may fairly be drawn, in the absence of evidence to the contrary, that the employee was injured in the course of his employment ......"

Upon this appeal it is not our province to weigh the evidence presented before the referee and reviewed by the board; our only inquiry is whether there was evidence competent in law to support the findings and whether on such findings the law has been properly applied: Kuca v. Lehigh Valley Coal Co., 268 Pa. 163, 110 A. 731; Vorbnoff v. Mesta Machine Co., 286 Pa. 199, 133 A. 256; Puza v. P. & R. C. & I. Co., 98 Pa. Superior Ct. 139; Nych v. Pressed Steel Car Co., 103 Pa. Superior Ct. 325, 158 A. 281; Johnston v. Orcutt Garage, 103 Pa. Superior Ct. 507, 157 A. 46. The issue was one of fact and the legislature has committed final decision thereof to the compensation authorities. The sole power conferred upon us is to determine whether there was legally competent evidence to sustain the findings of the board and whether the law has been properly applied to those findings.

After a careful examination of the entire record we believe that the award of the board should be sustained.

The assignments of error are overruled and judgment affirmed.