Thomas, Appellant, *v.* Mills.

Argued January 16, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*J. E. Gallagher,* with him *Irving L. Epstein, Carlon O'Malley, Edwin Utan,* and *Richard Conaboy,* for appellants.

*Harry P. O'Neill, Jr.,* with him *Frank M. Walsh,* and *Walsh & O'Neill,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, March 25, 1957:

Plaintiffs and the additional defendant appeal in this trespass action from the refusal of the Court of Common Pleas to grant a new trial after a jury verdict was returned in favor of the original defendants and against the additional defendant.

The action arose out of a motor vehicle accident in which an automobile operated by the minor plaintiff's brother, Clarence Thomas, collided with the rear end of a coal truck owned by H. B. Mills and operated by Everett Finch. Suit was originally instituted by the father of the minor plaintiff as her guardian and in his own right against the owner and the operator of the truck. These original defendants then brought in the driver of the automobile, Clarence Thomas, as an additional defendant. Upon the father's death, a court-appointed guardian for the minor and the administratrix of the father's estate were substituted as plaintiffs.

The accident occurred about 3:15 in the afternoon of June 6, 1953, north of Scranton, Pennsylvania, on a four-lane, divided concrete highway, U. S. Route 11, which runs generally north and south, at a point where a "T" intersection is formed by a macadam road leading eastwardly called Brookside Road. It was a rainy afternoon and the road was wet. The right front of the Thomas automobile ran under the left rear of Mills' coal truck, which had stopped or was moving slowly in the right-hand lane preparatory to entering

Brookside Road. The minor plaintiff, a little girl who was sitting in the front seat on the lap of one of her brothers, was very seriously injured and suffered permanent disfigurement.

The plaintiffs' contention was that the Mills' truck had suddenly and without warning stopped at the entrance of the intersection, thus causing the accident. The version of the original defendants, Mills and Finch, was that Finch, the driver of the truck, had set his right-turn signal several hundred feet from the intersection, that he then gradually slowed his speed to about ten miles per hour and was in the process of turning right onto Brookside Road from the right-hand lane when the truck was struck from the rear by the automobile driven by the additional defendant Clarence Thomas, and defendants contended that the accident was due to the additional defendant's negligence in following too closely at an excessive rate of speed, in failing to note the truck's signal and turn preparations, and in failing to pass the Mills' truck in the left passing lane open to him. There was evidence by disinterested witnesses that immediately after the accident, the truck's right-turn signal was on. Thomas, the driver of the automobile, testified that he had been following the truck for about two miles, and was travelling about 30 miles per hour; that when the truck stopped at the intersection, as he claimed it did, he was 100 feet away, that there were no other cars on the road, and nothing to obscure his vision.

The jury in finding for Mills and Finch, and against Clarence Thomas, apparently accepted the original defendants' version. There is no question that this finding is amply supported by the evidence, and appellants do not here contend that the finding was against the weight of the evidence. The appeal here is based solely on the charge to the jury, the conten-

tion being that the trial judge had "dogmatically" expressed his opinion as to additional defendant's negligence, had emphasized the negligence of the additional defendant and had minimized the negligence of the original defendant Finch, and that the trial judge had erred in refusing to charge that Finch, the driver of the truck, was under an obligation to look to the rear before stopping or turning.

The trial of this case took place over a three-day period. Sixteen persons gave testimony. No errors at trial are alleged by appellants, and, indeed, our perusal of the record convinces us that the learned trial judge presided over the trial in complete fairness and propriety. The charge to the jury was a lengthy and complete one, covering some eighteen typewritten pages, and taking, we are told, the better part of two hours to deliver. About halfway through the charge, after instructions as to the function of the jury, the negligence concept, and the application of that concept to the operation of motor vehicles, the trial judge related the facts as to the additional defendant, Clarence Thomas. At one point therein, the court made the statement of which appellants principally complain: "Now, members of the jury, the conclusions as I have said before are for you, and I may not even interfere with them. I very seldom express an opinion in a case—that really isn't my job—but I cannot see under this evidence how you could come to any other reasonable conclusion but that Mr. Thomas was negligent on this occasion. Of course, it is for you to say, it is your responsibility, but how any reasonable person could come to any other conclusion I personally cannot see.". This statement, urge the appellants, ". . . was tantamount to removing from the jury's consideration the question of the negligence of the driver of the Thomas car, in which the minor plaintiff was a pas-

senger, thereby indirectly seeding in the jury's mind the initial doubt as to any negligence on the part of the driver of the lead vehicle, the truck of the defendants.". With this contention we disagree. We have frequently held that a trial judge may express his opinion on the facts in a case if he makes it abundantly clear that it is the jury's opinion and not his that must govern in the determination of the issues. At no fewer than a half dozen separate places in the charge the court below clearly emphasized that the conclusions as to negligence were for the jury as to all of the defendants. In summing up his charge, the trial judge again stated, ". . . All conclusions, members of the jury, of course, are for you, and these things that I am pointing out to you I am doing it because it is my duty so to do, and I am not indicating one way or the other what your decision should be. I have the utmost confidence and faith in your ability to render the right decision in this case.", and thereafter he laid out the alternative decisions to which the jury might come, as follows: "Now, members of the jury, there are three different situations. You may come to the conclusion that the Thomas boy who was driving this car was the person solely responsible for this accident. In other words, you may come to the conclusion that it was his negligence that caused this collision and not any negligence on the part of the truck driver. Well, in that event if you come to that conclusion your verdict would be for the plaintiffs against Clarence Thomas alone. You may come to the second situation, members of the jury, where you would conclude that the only one responsible for this accident was the truck driver. In other words, you might come to the conclusion that it was the negligence of the truck driver who caused this accident, and it was his negligence alone and not the negligence of Clarence Thomas. In

that event, members of the jury, your verdict would be for the plaintiffs against the truck driver and the truck owner. You would have to find against both because the employee's negligence binds the owner as well as himself. You might come to the third situation, members of the jury, where you would come to the conclusion that both drivers on this occasion were guilty of negligence; in other words, that the truck driver was negligent and that Clarence Thomas was negligent, and then your verdict would be for the plaintiffs against both defendants or all defendants since there would be three of them. It would be against the truck driver, the truck owner, and the driver of the Thomas car.".

Indicative of the jury's understanding that the issues of fact were for it alone to determine, is that the jury retired for about an hour and a half, then returned to the courtroom to ask some pertinent questions of the court, and thereafter retired for another five hours before returning its verdict.

In carefully reading the charge as a whole, as it must be read in order to determine its ultimate effect: *Masinko et al. v. McLeary*, 337 Pa. 355, 11 A. 2d 648; *Cain v. Kohlman*, 344 Pa. 63, 22 A. 2d 667; *Robinson et al., Admrs. v. Philadelphia Transportation Co. et al.*, 347 Pa. 288, 32 A. 2d 26; *Bollinger, Admrx. v. West Penn Power Company*, 365 Pa. 599, 76 A. 2d 214; it is perfectly clear that the issues of fact were fully, fairly and adequately presented to the jury, and that the applicable principles of law were correctly explained to it.

The appellants also except to the refusal of the trial judge to charge that the truck driver had a duty to look to the rear before stopping or turning, regardless of whether he signalled his intention. They base this duty on Section 1012(a) of The Vehicle Code,

Act of May 1, 1929, P. L. 905, as amended, 75 PS §571, which states: "(a) The driver of any vehicle upon a highway, before starting, stopping or turning from a direct line, shall first see that such movement can be made in safety, and, if any pedestrian may be affected by such movement, shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle approaching or following may be affected by such movement, shall give a signal, as required in this section, plainly visible to the driver of such other vehicle of the intention to make such movement.".

It is obvious from the title of this section, "Signals on Starting, Stopping or Turning.—", and from a reading of Sections (b) through (f), pertaining to the manner of giving the signal, the form of the hand signal, the authorization to make regulations pertaining to signals, the working order of mechanical signals, and the prohibition of the indiscriminate use of such signals, that this section of The Vehicle Code pertains to signals alone, and does not pertain at all to other types of caution required by operators of motor vehicles. Certainly the words in Section (a) "shall first see that such movement can be made in safety", cannot alone be construed, as urged by appellants, as placing a duty upon those about to make a turn to look to the rear before so doing. The obligation to see that any movement "can be made in safety" is a legal truism, almost synonymous with the duty to act as a "reasonable man under the circumstances", and what "making a movement in safety" is in a particular situation depends on all the circumstances of the case. There are no doubt numerous instances where failure to look in a given direction may be negligent, or may be negligence per se, but where a large truck in the afternoon on a four-lane divided highway slows down

(or stops) at an intersection in the proper right-hand lane, leaving the left-hand or passing lane clear, preparatory to making a right-hand turn, and where, in addition, the truck driver properly signals his turn according to The Vehicle Code, then we cannot say that it is reversible error to fail to charge that the truck driver has the further duty of looking to the rear. Particularly is this true when we recall the primary duty of a driver to look in the direction in which he is going and to observe the intersecting highway into which he proposes to turn.

We are convinced, therefore, that the charge to the jury of the learned trial judge was eminently fair to all parties, and that his interpretation of the applicable law in his charge was correct.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

It is a reluctant pen which guides the Dissenting Opinion in this case, since I have a very high regard for the able Judge who presided over the trial which is the subject of review here. However, my responsibilities as an appellate judge do not permit me to draw a curtain of forbearance over what seems to me to have been a serious error which may well have occasioned an unjust verdict. But it is a paradox that, while my sense of duty impels me to look at the record as it is, my colleagues, with an equal sense of obligation to duty, apparently believe that while they should not throw a blanket of impermeability over the record, they should cover it with a veil of sanctity insofar as it appertains to the Trial Judge's actions. The Majority is of the impression that once the Trial Judge tells the jury that it is their function to determine the facts in the case, no harm can befall any of the par-

ties, even though the Judge in other language completely obliterates his original instruction. On this subject of a trial judge's responsibility, a wide chasm and a deep gulf separate me from the views entertained by my judicial brothers.

On June 6, 1953, Mary Anne Thomas, a child nine years of age, was riding in a Ford automobile, with her brother Clarence Thomas at the wheel, when the car came into violent contact with the rear end of a truck preceding it on the highway. She was thrown against the windshield, suffering grave injuries which left her with a tragic disfigurement and a brain involvement which subjects her to facial paralysis, an irregular gait, and convulsive seizures.

Clarence Thomas testified at the trial that he was following, at a distance of 100 feet and at the speed of 30 miles per hour, the truck of the defendant H. B. Mills, being driven by the defendant Everett Finch. He testified further that at a certain point on the highway, the truck, without warning signal from the driver, suddenly stopped, and that he (Thomas) tried to avoid hitting the halted vehicle by applying his brakes and swinging to the left. However, space and time did not permit a successful completion of the attempted maneuver and accordingly the right fender of his car came into violent contact with the left rear end of the truck. The resulting impact was of such force that the 9-year-old passenger was knocked unconscious and she remained in that state for 20 days. Several times during that period her life was despaired of.

Everett Finch, the driver of the truck, related a different story as to how the accident happened. He said that, in anticipation of making a turn into an intersecting street, he put on his automatic turning signal and that while he was in the act of turning, a car to the rear crashed into his truck.

The father of the child, Eugene Thomas,* filed suit in his own name and in the name of the child, against the driver and owner of the truck, and they, in turn, brought in Clarence Thomas, as additional defendant. The jury in its verdict exculpated the truck owner and driver of all responsibility for the accident, and fixed the blame entirely on Clarence Thomas, the minor plaintiff's brother, the driver of the car in which Mary Anne Thomas was riding.

Both the plaintiffs and Clarence Thomas moved for a new trial on the ground that the Trial Judge's charge to the jury was prejudicial to them in that it favored the truck driver's version of the mishap over Clarence Thomas's version. As I see this appeal, the motion for a new trial does not merely represent the act of a disappointed litigant raising sails on the ship of a defeated cause, hoping that some vagrant or wanton wind might bear the craft into a happier port. I believe that the appellants are aboard a ship laden with a cargo of legal and justified complaint.

In his charge to the jury, the learned Trial Judge said: "Now, members of the jury, the conclusions as I have said before are for you, and I may not even interfere with them. I very seldom express an opinion in a case—that really isn't my job—but I cannot see under this evidence how you could come to any other reasonable conclusion but that Mr. Thomas was negligent on this occasion. Of course, it is for you to say, it is your responsibility, but *how any reasonable person could come to any other conclusion I personally cannot see.*"**

The Trial Judge's conclusion runs head-on into a decision by this Court which clearly states that no

---

* The father died after the beginning of the action and the administratrix of his estate was substituted in his stead.

** Italics throughout, mine.

inferences rise from rear-end collisions. In the case of *Cirquitella v. Callaghan,* 331 Pa. 465, 467, we said: "It does not follow that the mere happening of a rear-end collision constitutes negligence as a matter of law on the part of the operator of the rear automobile. The occurrence of such a collision does not raise a presumption that the driver of either vehicle was negligent. It is a question of fact for the jury to be determined from all the evidence of the case."

The Trial Judge said that it would be "unreasonable" for the jury to find Clarence Thomas free of negligence. Why should such a finding be unreasonable? Thomas was driving his car at 30 miles per hour, which is certainly not an excessive rate of speed on a four-lane highway, he was on his right side of the road, he was following the defendants' truck at a distance of 100 feet. Why did the Trial Judge so categorically assert that Clarence Thomas was thus unequivocally and definitely guilty of negligence? What authority did the Trial Judge have for so unbridled an utterance?

The Majority Opinion says that a trial judge may express his opinion of the facts "if he makes it abundantly clear that it is the jury's opinion and not his that must govern in the determination of the issues." How much is abundance, and what abundance will eradicate from a jury's mind the positive declaration of the judge that a certain person is guilty of negligence? Once a judge fractures the backbone of impartiality, can any abundance of splints and medication ever make it whole again?

The Majority Opinion says that "at no fewer than a half dozen separate places in the charge the court below clearly emphasized that the conclusions as to negligence were for the jury as to all of the defendants." The Majority then even goes on to say that the

impartiality of the Trial Judge was proved when he said: "I am pointing out to you I am doing it because it is my duty so to do, and I am not indicating one way or the other what your decision should be. I have the utmost confidence and faith in your ability to render the *right decision* in this case."

But as I see it, this later observation by the Trial Judge only compounded the original fault. The Judge had already told the jury what he believed the "right decision" to be. Having the "utmost confidence and faith" that the jury would render a "right decision" could only mean that he expected them to find in favor of the truck driver and against the car driver, Clarence Thomas. And that is exactly what the jury did. Did the plaintiff receive a fair trial under those circumstances? I do not think so.

Not only did the Judge tell the jury that he believed Clarence Thomas guilty of negligence, but he proceeded in the most effective style of presentation imaginable to demonstrate to the jury why they should find that Thomas was negligent. With Demosthenic dialectics he argued to the jury: "Now, the question might be asked, why didn't he [Thomas] bring his car to a stop if it was under the control that it should have been in view of all the circumstances in connection with the operation of his car, the number of people that were in the car, the type of car it was, the individual who was driving it, the condition of the pavement—why didn't it stop before it traversed 100 feet? In other words, according to him he was 100 feet away when that truck came to a dead stop. Now, you know what 100 feet is the same as I do. Why didn't he bring his car to a stop? Was he driving it at 30 miles an hour? He said it was. It is for you to say whether or not he was, members of the jury. The fact that it is uncontradicted is not conclusive upon

you. You may take into consideration the force of the impact in determining how fast his car was going. You may take into consideration the distance it traveled, what happened to it after the collision in determining the speed of the car, or even if he did not bring it to a stop why didn't he take it out into the lane that was clear of traffic if he was operating it as a careful, prudent person should. In other words, this accident according to him occurred on the right hand lane, the extreme outside lane of this highway, and the other lane of this highway was free and clear of traffic. If he was as alert and attentive as he was required to be under the circumstances in the operation of his car, why did he continue on and run into the rear of this truck? These are questions, members of the jury, that you should consider and may consider in determining whether or not he was negligent, and it is for you to say whether or not he was."

The fact that the Trial Judge ended this exhortation to the jury with the statement that it was up to them to determine whether Thomas was negligent or not, did not cure the injuries resulting from the heavy blows he had already administered to the plaintiffs' case.

When a judge slashes the neutrality of his charge with a partisan attack, any unctuous words which follow cannot heal, in the little time still remaining of the trial, the wounds he has inflicted.

There can be no doubt, of course, that the Trial Judge conscientiously believed that Thomas was guilty of negligence, but he had no right to take away from the jury the question which it was their constitutional duty to decide.

The functions of the advocate and the functions of a judge do not coincide. When a lawyer closes his law

offices and takes up chambers in the courthouse, when he discards his powers of attorney and dons the robe of a judge, he must give up the dramatic thrills of one-sided aggression. He is no longer Mr. *Ex Parte*; from now on, he is The Honorable *Judex Est Lex Loquens*.

From time to time this Court recognizes that judicial partisanship is an ill wind, but, like Mark Twain's comment on weather-commenters, it does very little, if anything, about it. In the enforcement of judicial impartiality this Court employs about as much vigor as the feathery chastisement applied by a doting father to his tantrums-driven child. As recently as January, 1956, in the case of *Keating v. Belcher,* 384 Pa. 129, 132, this Court said: "The Judge should also bear in mind that undue interference with the trial of a case and *undue* emphasis of one side of the case or intemperate treatment of witnesses or counsel are not in the interest of Justice." (Italics in original). But in that very *Keating* case, this Court condoned one of the most flagrant demonstrations of judicial tyranny that has ever disgraced a courtroom. In that case the Trial Judge so criticized, lampooned, condemned, and humiliated one of the parties, plus his witnesses and lawyer, that the entire judicial process degenerated into black-gowned despotism, with the victimized party having no more chance of an impartial decision than the chairman of the House Un-American Activities Committee would have in a trial in Moscow.

I do not mean even remotely to suggest that the errata in the charge of the able Trial Judge in this case fell into any mold which resembled in any way, shape, manner, or form the one arrogantly chiseled by the Judge who presided in the *Keating* case. I only observe that the experienced Trial Judge here was most unfortunate in his choice of language and probably influenced the jury to a degree that he never in-

tended. For instance, it can only be a matter of regret that he should have suggested, without the shadow of a syllable of testimony to support the suggestion, that Clarence Thomas might have been dozing at the wheel just before the accident. Thomas had testified that the truck driver failed to give any signal that he intended to stop. The Trial Judge commented on this testimony as follows: "Would the accident have happened, members of the jury, regardless of the absence or presence of any signal? In other words, supposing and assuming that the truck did come to an abrupt stop and no signal was given, would the accident have happened anyway? Here was a man following that truck, nothing to obstruct his view, and he is 100 feet behind it. Now, if he was looking and attentive he should have had his eyes on that truck. It was right ahead of him. Now, suppose *he was just taking a little snooze* or discussing things with the people in the car with him or looking out the window to the side and not looking ahead of him and did not see the truck, well, if there was a signal given on the truck he would not have seen that either. If he could not see the truck he certainly could not have seen any signal given."

If anybody was snoozing at this point of the trial, it was the figure of Justice hiding behind her thick blindfold. There was no justification whatsoever for the Judge to advance the proposition that Thomas may have been snoozing or looking out the window to the side. After a long trial it sometimes becomes difficult for a juror to remember whether a certain image lodged in his brain (this one of Thomas sleeping at the wheel) resulted from testimony given from the witness stand or was an illustration posed by the judge. In addition, the Judge said that Thomas said he could not see the truck. This is contrary to the testimony. Thomas said he saw the truck. He ran into it because the

truck driver stopped suddenly, not because he did not see the truck.

In emphasizing what he regarded as Thomas's fault the Judge kept insisting that in a distance of 100 feet Thomas could easily have come to a halt. He so emphasized, underlined, and italicized the 100 feet that in the jury's mind the distance must have assumed an imagined length which stretched far beyond its lineal measurement. In point of reality, 100 feet is so short a distance that a car travelling at 30 miles per hour, would cover it in as little a time as two seconds. If then, the truck driver did not, as Thomas testified, give a signal, and he did, in fact, come to a "dead stop" suddenly, why should the following car's unavoidable crashing into the rear of the truck be regarded as a conclusive act of negligence?

In the case of *Keller v. Keystone Furniture Co.,* 132 Pa. Superior Ct. 547, it was argued, as the Trial Judge did here, that in a rear-end collision it did not matter too much whether a signal was given or not. The Superior Court rejected this view: "Appellant's main argument on this point is that no signal by its driver was necessary as both Miss Kreger and Mrs. Keller were looking at the truck and 'saw it stopping' ahead of them. But their testimony, when viewed in the light most favorable to appellee, does not show they were aware for any appreciable period of time that appellant's truck was about to stop upon the highway . . . Even though Miss Kreger may have been aware that the truck was slackening its speed, she had a right to assume it would not suddenly come to a full stop without warning. We think there was sufficient evidence of negligence upon the part of the driver of appellant's truck to justify submission of that question to the jury."

The Majority sees nothing wrong about the refusal of the Trial Judge to instruct the jury of the duty devolving upon the truck driver to look to the rear before stopping or making an abrupt turn on the highway. Section 1012(a) of The Vehicle Code says: "The driver of any vehicle upon a highway, before starting, *stopping or turning from a direct line, shall first see* that such movement can be made in safety . . ."

How can a driver see if such a movement can be made in safety unless he looks? Looking does not mean that the motorist must swivel his head around until his eyes are facing the rear. It means that he should so use the mirror with which his vehicle should be equipped that he may see what is to the rear. The truck driver testified that he did not look to see what was behind him. Instead of leaving to the jury whether this failure on the part of the truck driver to follow the provisions of The Vehicle Code constituted negligence, the Trial Judge practically made a virtue of the truck driver's defection in this respect. He said to the jury: "There was testimony in the case by the truck driver that he didn't bother looking when he approached this intersection to see if any other cars were approaching from the rear. Members of the jury, in itself, that was not negligence. As we view this case, if that truck driver was proceeding on the outside lane and was attempting to go into this macadam highway at a slow rate of speed, driving his truck carefully and pulling his signal, there was no obligation on his part to look to the rear, and the fact that he did not is not negligence, and no award could be based on that fact alone."

This instruction, of course, ignored the testimony to the effect that the truck driver did not "pull his signal"; it ignored the fact that two eyewitnesses to the accident called by the truck-driver defendant said

that they did not see turn signals on the truck prior to the accident; it ignored what this Court said in *MacNeill v. Makos,* 366 Pa. 465, 467: "The Vehicle Code of 1929 provides that a motorist shall signal when he intends to stop. The obvious purpose of that section is to give adequate warning to other motorists so that they can take appropriate action to avoid a collision. *If a person in stopping his car fails to give such a signal and that failure is the cause of an accident, the person so stopping is liable.*"

Perhaps we will never know whether the tragic accident in this case resulted from a failure by Clarence Thomas to heed the truck driver's signal, or whether the truck driver failed to display a signal. But we do know that Mary Anne Thomas did not receive the jury trial to which she was entitled, and the record will show that this Court, having an opportunity to salvage something from the wreck of a salutary rule on the highway of the law, passed it by, thereby inviting wrecks of other rules, as well as other judicial usurpations and other acts of injustice.