Luterman, Appellant, *v.* Philadelphia.

Argued April 28, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Melvin Alan Bank,* with him *Maurice Abrams,* for appellants.

*Vincent C. Veldorale,* Assistant City Solicitor, with him *Bernard S. Cheskin,* Assistant City Solicitor, and *David Berger,* City Solicitor, for appellee.

OPINION BY MR. JUSTICE McBRIDE, June 30, 1959:

The plaintiffs sued in trespass to recover for loss suffered by reason of damage caused by the flooding of their business premises by water which leaked from the city's water line adjacent to their property. The jury's verdict was for the defendant. Plaintiffs' motion for new trial was based on instructions to the jury which, the plaintiffs contend, amounted, erroneously, to binding instructions for the defendant. The court below refused the motion for new trial and directed the entry of judgment on the verdict. The plaintiffs have appealed. It is a well settled principle of law that the granting or refusal of a new trial is within the sound discretion of the trial court, and this Court will not reverse the trial court unless the record shows that this discretion was clearly and palpably abused. *Streilein v. Vogel,* 363 Pa. 379, 69 A. 2d 97; *Frank v. W. S. Losier and Co., Inc.,* 361 Pa. 272, 64 A. 2d 829.

It is not necessary to review the testimony in detail since plaintiffs concede that the case presented a jury question and are complaining only of trial error. Both parties filed an agreed statement of facts in lieu of printing the Record. From that statement we learn that a fire hydrant in front of the plaintiffs' premises had been struck and damaged by an automobile truck, necessitating its removal and replacement by employees of the city's water department. In order to replace the broken hydrant, it was necessary for the workmen to excavate around it to a depth sufficient to reach the connection between the hydrant and the water main. The work was not completed on the first day, and when the city's employees returned on the morning of the

second day the premises of the plaintiffs were flooded with water, causing substantial damage.

Plaintiffs' theory of the case and their evidence was to the effect that although the City was not responsible for the original damage to the fire hydrant, the City was liable for its negligence in failing to take adequate measures while repairing the damage so as to prevent water from escaping into plaintiffs' adjoining business premises. Plaintiffs contended and introduced evidence to prove: (1) that the repairs were not adequately made so that the hydrant leaked during their course; (2) that, at the close of the work day the hydrant was not properly shut off; and (3) that no adequate precautions were taken at the close of the work day to assure that the condition in which the hydrant was left, assuming it to have been proper, was not disturbed.

There was conflicting testimony as to whether water was still leaking from the hydrant when the employees of the City left for the day, and as to whether there was water in the excavation made by the City. The damage to plaintiffs' premises admittedly could have been found by the jury to have been caused during the night following the City's first day's work when water from the hydrant leaked into the ground floor of the plaintiffs' property. The Trial Judge carefully reviewed all the evidence in his principal charge to the jury. The jury returned for further instructions and it is the Judge's replies to these inquiries which are the basis for this appeal.

When the jury returned for further instructions they posed two questions to the court: "Was there a valve close enough to the hydrant to close the water off from the hydrant and at the same time leave the water on in the main. The second is, does taking sufficient care mean guarding against a third party tampering with the fire hydrant?"

The answer of the Trial Judge to the first question was impliedly concurred in by counsel for plaintiff since he manifested no disagreement with it,[1] and although it is now contended that it was erroneous, we will not consider that contention. *Lyons v. Wargo,* 386 Pa. 482, 126 A. 2d 411.

The Trial Judge answered the second question as follows:

"THE COURT: Well, guarding against a third party would not be the duty of the City in this case. The City would not be expected and could not be required to have some guard stand there all night and see that nobody disrupted or interfered with what they had done. What duty the City, however, would be required to do would be to reasonably protect and warn people from going near it by putting up the barricades, setting up the lights. *If they did that,* I would say, under the circumstances, they did everything that the City would be required to do. Now, if you think with those further instructions you will be able to get somewhere, you can go out again and try it. THE FORELADY: Do you want us to go again? MR. BANK: If your Honor please, I would like an exception to your Honor's answer to the second question. THE COURT: You may have it. That is what I think about the law. If I am wrong, why, I will have to be corrected. *You are not suggesting the City ought to put a policeman there all night, are you?* MR. BANK: No, sir. *But I am suggesting the stem of the fire hydrant could have been capped off so nobody could touch it.* THE COURT: *I do not agree with that,* members of the jury. I believe that

---

[1] The Act of July 20, 1953, P. L. 552, eliminating the necessity of taking "exceptions", does not mean that a party need not "object" or otherwise make known to the court that he disagrees with a ruling or a part of a charge unless the matter is too fundamental to be ignored by an appellate court.

stem could be and is protected in the barrel. It is underground. It is covered by a board. *In my opinion, the City did everything it should under those circumstances,* and the valve that eventually was put in place and set, and was set throughout *according to the testimony of the City's witnesses,* was set after noon, because they said they dug in their shoes, without boots, because there was no water in there. As I understand it, that was the valve that was set in the rod that went down to the compression valve at the bottom of this hydrant." (Emphasis supplied.)

Applicant contends that the Trial Judge invaded the province of the jury and in effect gave binding instructions. It must be remembered that at the end of the main charge counsel for plaintiff had specifically stated that he had no exceptions. In that main charge the Trial Judge had specifically informed the jury, in three places, that it was their duty to find the facts and that they were the sole judges of the facts.[2] It is true that the type of instruction given to the jury at the last minute may sometimes outweigh a previous instruction but it does not appear to us to have been so in this case. The exchange of views between court and counsel, quoted above, demonstrates that counsel suggested, as a possible ground of negligence, that the 6″ pipe should have been capped as a precautionary meas-

---

[2] Thus the Trial Judge said: "That will be for you to determine after your consideration of all the evidence in this case. . . ." Again: ". . . it is your recollection of the testimony and not that of counsel *nor of the court* that governs. It is your recollection of the testimony that counts, and you, the members of the jury, are the sole finders of the facts and the inferences which you may reasonably infer from the facts." (Emphasis supplied.) And finally: ". . . There certainly is a difference in the two stories and, you being the sole judges of the facts, it becomes your responsibility and duty to attempt to reconcile this testimony. If you cannot, then you decide what testimony to accept and what testimony to reject."

ure; but in the agreed statement of facts filed on appeal it was specifically agreed that "No testimony was introduced at the trial on the subject of capping the six inch pipe as a precautionary measure." In view of this fact it would have been error against the City to suggest such a conjectural possibility as a ground of negligence. *Hepler, Admx. v. Hammond,* 363 Pa. 355, 69 A. 2d 95; *Minster v. Philadelphia Rapid Transit Company,* 115 Pa. Superior Ct. 562, 176 Atl. 762.

There remains only for consideration the unequivocal statement by the court that the City was not bound to anticipate that a third party would disrupt or interfere with the project and that it was sufficient to put up barricades and lights and that it was not necessary that the City post a policeman. Viewed either as a statement of law or a comment on the facts, *Thomas v. Mills,* 388 Pa. 353, 130 A. 2d 489, *Schultz v. Pivar,* 370 Pa. 271, 88 A. 2d 74, the statement of a Trial Judge was fully justified. *Philadelphia Ritz Carlton Co. v. Philadelphia,* 282 Pa. 301, 127 Atl. 843. It must be remembered that in concluding his answer to the forelady's second question, the Trial Judge stated: *"If they did that,* I would say, under the circumstances, they did everything that the City would be required to do." (Emphasis supplied.)

The italicized clause, simply stated the premise for the application of the correct legal principle which the Trial Judge had explained. This sentence did not usurp the jury's function. The jury still had to determine whether the City's employees had taken all of the precautions to which they had testified.

Had the plaintiff presented a point for charge to the effect that it was the duty of the City to post a policeman or a guard overnight, or that it was the duty of the City to cap the 6″ pipe, the court would have been fully warranted in refusing such point and in say-

ing so to the jury. The Trial Judge clearly did not abuse his discretion in denying defendant's motion for a new trial.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Trial Judge in this case presides over trials with an ability, impartiality, and obvious love of justice that makes him an ideal arbiter in the arena of legal controversy. It is, therefore, with no diminution of admiration for his juristic attributes that I conclude that in this case he was in error. This conclusion is certainly no reflection on his laudable trial record, because it will be remembered that even Homer nodded.

The issue in the trial was a simple one. A fire hydrant in front of the premises owned by the plaintiffs was struck by an automobile and sheared off at ground level, bringing to the children in the area the joy of a gushing geyser and to their parents the threat of an inundation. The City hurried to the aqueous scene with its workmen who shut off the valve on the water main servicing the hydrant and then proceeded to make the complete repairs necessary to restore water service. Since they could not complete the job by nightfall, they reopened the valve in the main, closed the valve leading to the hydrant and departed for their homes, apparently satisfied that all would be well until the following morning when they would return to complete their operation.

However, during the night the plunging waters in the pipes broke their bondage and flooded the basement of the premises belonging to the plaintiffs who brought suit against the City of Philadelphia for the damages they suffered. The plaintiffs charged negligence on the part of the workmen who had left the night of the first

day without taking the necessary precautions to protect the properties adjacent to the decapitated hydrant.

The City denied negligence and the cause came to trial. After the issue had been submitted to the jury for deliberation and verdict, the jury returned to the courtroom to ask the Judge two questions. We are concerned only with the second question, namely, "Does taking sufficient care mean guarding against a third party tampering with the fire hydrant?" The Court answered: "The city would not be expected and could not be required to have some guard stand there all night and see that nobody disrupted or interfered with what they had done. What duty the City, however, would be required to do would be to reasonably protect and warn people from going near it by putting up the barricades, setting up the lights. If they did that, I would say, under the circumstances, they did everything that the City would be required to do."

The plaintiff's attorney objected to this ruling and asked for an exception. Then the following ensued: The Court: "You may have it. That is what I think about the law. If I am wrong, why I will have to be corrected. You are not suggesting the City ought to put a policeman there all night, are you?" Mr. Bank: "No, sir. But I am suggesting the stem or the fire hydrant could have been capped off so nobody could touch it." The Court: "I do not agree with that, members of the jury. I believe that stem could be and is protected in the barrel. It is underground. It is covered by a board. In my opinion, the City did everything it should under those circumstances, and the valve that eventually was put in place and set, and was set throughout according to the testimony of the City's witnesses, was set after noon, because they said they dug in their shoes, without boots, because there was no water in there. As I understand it, that was the valve that was

set in the rod that went down to the compression valve at the bottom of this hydrant. Well, see what you can do, members of the jury."

It must be obvious here that by these instructions the Court took the whole question of negligence away from the jury. In his main charge the Judge had said that the City was required "to exercise due care in making the repairs in order not to injure the property of others." Did the City use due care? Until the Judge answered the question put by the jury, the problem of due care was to be solved by the jury. However, after the Judge spoke, the jury had nothing to say about due care, it had nothing to say at all about the case. The Judge spoke for them when he said: "The City would not be expected and could not be required to have some guard stand there all night and see that nobody disrupted or interfered with what they had done."

But it is not to be excluded that the City might have had an obligation to place a guard at the site of the missing hydrant. If the danger was great, if the surrounding area could be flooded to a depth which might endanger life, it would certainly have been the duty of the City to post a guard. If there had been a fire at this point and shaky walls had been left standing, the City would certainly have been required to station a fireman or policeman there to see to it that no third persons tampered with the walls, imperiling people and property in the area.

The Judge said that if the City put up barricades and set up lights, that that would be enough to disobligate the City from responsibility for any ensuing damage, but the City could barricade and light up the hydrant spot and still be negligent because it would be a question for the jury as to whether the barricade and lights had been properly installed and were adequate under all the circumstances.

But the Judge went further. With great respect I say that he waded deeper into error when he said: "In my opinion, the City did everything it should under those circumstances." If the City did everything it should under the circumstances, that was the end of the case. When a jury comes into the courtroom and asks for specific instructions, and the Judge tells them that the defendant has done all that can be expected of it under the circumstances, there is only one thing for the jury to do and that is to render a verdict for the defendant, which the jury here promptly proceeded to do.

The Judge did not say that his opinion was not binding on the jury. Categorically he said that it was his opinion the City was not liable. He emphasized his view when he said: "That is what I think about the law. If I am wrong, why I will have to be corrected." Since no one stood up and corrected the Judge at that point, the jury could well conclude that the Judge stood uncorrected. It is unnecessary to add that the jury had no reason to assume that the correction had to come from an appellate court. Even so, it was bound by what the Trial Judge said to them and not what they might imagine, speculate, and guess as to what an appellate court would do, many months later.

When the Judge spoke as he did, he in effect turned off the hydrant of deliberation, he shut off the flow of discussion, he stopped the stream of reasoning. There was nothing more for the jury to do but to bring in the dry, mud-caked verdict already prepared for them.

This Court, in affirming the action of the Trial Judge, dwells on the point that the Trial Judge had in his main charge charged the jurors that they were the sole finders of the fact. The Majority Opinion admits, however, that the instructions by the Judge given at the last minute "may sometimes outweigh a previous

instruction." But, after this forthright concession the Majority Opinion goes on to say: "but it does not appear to us to have been so in this case." By what clairvoyance the Majority arrives at this conclusion the Majority does not say. How does the Majority know that the jury was not influenced by the Trial Judge's last words to them? The fact that there was the possibility that the jury could have been so influenced was enough in itself to vitiate the verdict.

The Majority Opinion also justifies the Trial Judge's last minute instructions by asserting: "It must be remembered that in concluding his answer to the forelady's second question, the Trial Judge stated: 'If they did that, I would say, under the circumstances, they did everything that the City would be required to do' ". It must be noted, however, that, *later* the Trial Judge said: "In my opinion, the City did everything it should under the circumstances."

I dissent.