# Burd, Appellant, *v.* Pennsylvania Railroad Company.

Argued May 23, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Elmer E. Harter,* and *H. Albert Lehrman,* for appellants.

*John McI. Smith,* with him *W. E. Shissler, James H. Stewart, Jr.,* and *Nauman, Smith, Shissler & Hall,* for appellee.

Opinion by Mr. Justice Benjamin R. Jones, October 10, 1960:

These are two appeals from an order of the Court of Common Pleas of Dauphin County granting a new trial in two separate trespass actions[1] which arose out of a grade crossing accident on September 19, 1952.

The jury returned a verdict of $60,000 for Burd and $15,000 for Ulrich[2] and against the Pennsylvania Railroad Company. Motions for judgment n.o.v. and for a new trial were filed by the Railroad in each case. The court overruled the motions for judgment n.o.v. and granted new trials on the ground that the verdicts were "against the preponderance of the evidence". From this order awarding the Railroad new trials, Ulrich and Burd have appealed.

The appellants, Denton B. Burd and Robert P. Ulrich, employees at the Olmstead Air Force Base, Middletown, Pa., at about 8:33 a.m. (EDST) on September 19, 1952 were engaged in hauling a load of steel by tractor-trailer southwardly on Route 441 from that base to Marietta. Ulrich was the operator of the vehicle and Burd was seated in the right-front seat beside him. As they proceeded eastwardly over a grade crossing located south of the Borough of Royalton, Dauphin County, where Route 441 crosses over the tracks of the Columbia Branch of the Pennsylvania Railroad Company,[3] the tractor-trailer was

---

[1] Both actions were consolidated for purpose of trial.

[2] Ulrich, joined by the Railroad as an additional defendant in Burd's action, was cleared of all liability by the jury.

[3] The grade-crossing and highway Route 441 can be briefly described at that point as a diagonal crossing of the two tracks of the Railroad with the highway proceeding in a southeastwardly direction across the tracks which, at that point, run almost due north and south forming an elongated acute angle with the apex of the angle at the railroad crossing.

struck by a southbound freight train which consisted of 47 box, tank and refrigerator cars propelled by an electric locomotive.

The tractor-trailer, which had an over-all length of 64 feet, was struck at a point 14 feet from the rear of the trailer. Both Burd and Ulrich had traveled the route on a number of prior occasions and were familiar with the crossing. Under normal weather conditions there is an unobstructed view in excess of fourteen hundred feet looking north—the direction from which the train approached—from the crossing. Fourteen hundred feet north of the crossing was a whistle sign erected on a catenary pole and the tracks run in a straight line from that sign to the crossing. A "Stop, Look and Listen" sign guarded the crossing. At the time of the accident it was daylight and the weather was rainy.

According to the testimony of the engineer and fireman, when the train was 100 to 150 feet past the whistle sign,[4] the engineer gave four blasts of the whistle,—two long, a short and a long—, and at the same time opened the automatic valve which rang the bell continuously to the crossing. Their testimony fixed the speed of the train at between 20 and 23 miles per hour and that of the truck at 25 miles per hour. They also testified that the tractor-trailer slowed down and then started across the tracks without coming to a stop. The engineer further testified that, at a point 250 feet from the crossing, he first observed the tractor-trailer proceeding southwardly ahead of him on the highway; that when he was 100 feet from the crossing he saw the tractor-trailer enter the crossing, whereupon he applied the emergency

---

[4] The engineer testified that the train had been stopped at a signal tower 2,500 feet north of the crossing and proceeded only after the signal to do so was given.

brakes. The train stopped, according to his testimony, 350 feet south of the point of impact.

In addition to this evidence concerning the appellants' failure to stop at the crossing, the Railroad offered written statements given to an investigating officer of the Olmstead Air Force base. In these statements Ulrich and Burd both stated that they did not stop before entering the crossing. Burd, in his statement, said, "We didn't come to a full stop as we were making the turn at the meatpacking plant. We came to a point where we shifted into low gear and I would say that if it would have been necessary to stop that we could have stopped at two feet." Ulrich, in his statement, said, "I do not remember whether or not I made a full stop before I went up on the crossing. I don't think I did . . . I don't think I was to a full stop, but I do know I slowed down." The statements further indicated that Ulrich was watching the road ahead of him and looking beyond the railroad tracks at the hills and that it was Burd who directed Ulrich's attention to the presence of the train.

The testimony of the engineer and fireman as to the warning signals was corroborated by other witnesses. Two brakemen, riding backwards on the rear of the locomotive, testified that they heard the blasts of the whistle. They testified that these blasts consisted of the sequence, two longs, a short and a long. They did not hear the bell. A witness living in the Borough of Royalton north of the whistle sign and in sight of the tracks testified that he was on his roof fixing the antenna of his television set at the time and that he heard the blasts of the whistle and bell. Another witness, the track foreman, testified that he heard the train's warning signal being given and the emergency brakes being applied.

There was also testimony on the question of visibility. The operator of the signal tower 2,000 feet from the crossing testified that the crossing could be seen at the time from the tower. The witness who was fixing the television antenna testified to the effect that he could see the crossing over 1,400 feet away. The track foreman testified he saw the train at the crossing, immediately after the accident, more than 1,400 feet away. One brakeman testified he could see back along the train 20-25 car lengths and the other said he could see half the length of the train. The testimony of the U. S. Weather Bureau at Harrisburg Airport showed that, at 8:38 a.m. (EDST), it was raining and that the visibility was 2½ miles. The weather report taken at the Middleton Air Force base—one and one-half miles north by roadway of the crossing—at 8:29 a.m. (EDST) on September 19, 1952, showed that it was then raining and that visibility was five miles. Such was the evidence offered by the Railroad.

Burd and Ulrich testified that the tractor-trailer stopped when the front was five feet west of the southbound track. They testified that this was the usual place for them to stop and that they had a full view of the tracks to the north. Each testified that the windows were down and that they heard no whistles. Burd testified that he was purposely observant and, being the first to notice the train, called it to Ulrich's attention. Their version of the occurrence was that after Ulrich had come to a complete stop he put the tractor in low gear and proceeded to cross the crossing when the train, traveling south, came out of the mist or haze 300 feet north of the crossing and hit the trailer at a point 14 feet from the rear.

The only other witness to testify on appellants' behalf regarding the warning signal was a veterinar-

ian, Dr. Polino, who happened to be engaged in a conversation at a meat-packing plant situated near the crossing on the west side of the highway. He testified that he did not hear any signals from the train but that he was not paying any particular attention to them.[5] He testified that it was raining, a dark day, and that visibility was open. Another witness, who supervised the taking of pictures 1½ hours after the accident, testified that it was intermittently hazy and that, at periods, the visibility was 300 feet. The pictures themselves, however, revealed that at least at the time they were taken, although raining, the visibility was clear.

"It is a well settled principle of law that the granting or refusal of a new trial is within the sound discretion of the trial court and this Court will not reverse the trial court unless the record shows that this discretion was clearly and palpably abused." *Luterman v. Philadelphia,* 396 Pa. 301, 152 A. 2d 464; *Streilein v. Vogel,* 363 Pa. 379, 69 A. 2d 97; *Frank v. W. S. Losier & Co., Inc.,* 361 Pa. 272, 64 A. 2d 829.

We have examined this record and find no abuse of discretion or error of law on the part of the court below. The court correctly held that the weight of the evidence established that adequate warning was given, that there was visibility from this railroad

---

[5] This witness had been in conversation and he could not at the time of trial recall whether he heard anything or not. "Q. Did you hear any evidence of the approach of the defendant's train prior to the crash? A. No, sir, *not that I can recall.* Q. Would you state whether there was one blown? A. Not that I know of, not that I heard. Q. Was there any bell rung or horn blown *that you heard?* A. *Not that I was aware of.*" That he might have heard it but, because of his preoccupation in conversation, can not now recall it is indicated by the following colloquy: "Q. In other words, you weren't paying attention to what was occurring on the outside? A. No, sir."

crossing northerly in excess of fourteen hundred feet and that Ulrich and Burd did not stop at the crossing. As the court below stated in its opinion, "this conclusion . . . [was] based upon the various factors in the evidence . . . enumerated. The testimony of [Burd and Ulrich stands] alone on the essential and dispositive features of this case. They are contradicted not only by the employees of the railroad company who are interested witnesses, but in important aspects are contradicted by their own declarations and by testimony of disinterested witnesses. There [was] weighty contradiction of [Burd's and Ulrich's] version of this accident in all of the important aspects of this case. Their statements [were] lacking in corroboration except as to one phase, viz., the negative evidence of Polino [the veterinarian] as to warning. He was not being attentive to the approach of the train, and therefore hardly in a position to know what had transpired in the matter of giving signals of the approach of this train, and even he testified positively that when he went to the scene there was open visibility."

As the Superior Court said in *Venchik v. Penna. R. R. Co.,* 143 Pa. Superior Ct. 438, 443, 18 A. 2d 118: "'. . . it has been uniformly held that where the evidence to establish lack of proper care is negative only, it is overcome by the positive evidence to the contrary, though the latter comes from the mouths of defendant's witness, and, under such circumstances, the question is not one for the jury to pass upon, where the physical facts corroborate their testimony (Anspach v. R. R., 225 Pa. 528; Keiser v. R. R., 212 Pa. 409; Knox v. R. R., 202 Pa. 504; Zotter v. Lehigh Valley R. R. Co., 280 Pa. 14), which simply means that under such circumstances, the negative testimony, being controverted, does not amount to more than a scin-

tilla, and therefore cannot prevail to establish an essential fact' ": *Grimes v. Penna. R. R. Co.*, 289 Pa. 320, 137 A. 451; *Craft v. Hines, Dir. General*, 272 Pa. 499, 116 A. 379; *Haller v. Pennsylvania R. R.*, 306 Pa. 98, 159 A. 10.

It is not the province of the court to resolve conflicts in the testimony or to usurp the function of the jury, but it is the duty of a trial court to pass upon the weight of the evidence and to grant or withhold a new trial accordingly. *Edelson v. Ochrock*, 380 Pa. 426, 427, 111 A. 2d 455; *Hershey v. Pittsburgh & West Virginia Railway Co.*, 366 Pa. 158, 162, 76 A. 2d 379. Mr. Justice COHEN, speaking for this Court recently in *Kiser v. Schlosser*, 389 Pa. 131, 132 A. 2d 344, said: "True it is that the assaying of the credibility of witnesses and the resolving of conflicts in their testimony are for the jury. But it is equally true that the trial judge may not hide behind the jury's verdict; he has a duty to grant a new trial when he is convinced that the judicial process has resulted in the working of an injustice upon any of the parties." In *Bellettiere v. Philadelphia*, 367 Pa. 638, 643, 81 A. 2d 857, we said: " 'One of the least assailable grounds for the exercise of such power [to grant a new trial] is the trial court's conclusion that the verdict was against the weight of the evidence and that the interests of justice therefore require that a new trial be awarded . . .' "

We are fully satisfied that the court below did not abuse its discretion in awarding a new trial to the Railroad in each case.

Order affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

This Court continues to draw a distinction between so-called *positive* testimony and so-called *negative* testimony and, in doing so, makes a shambles, in this respect, of logic, ratiocination and elementary common sense. Testimony is neither negative nor positive. It may be credible testimony or incredible testimony, but it is not negative or positive. A "no" answer is just as positive as a "yes" answer since it describes a given situation. The absence of law and order is just as positive a situation as the presence of it.

If a witness testifies that on a certain day at a certain hour he was outdoors and it did not rain, is his testimony negative? Of course not. He has testified to a positive fact. The negation of the existence of a phenomenon, which is susceptible to the senses, does not mean that the statement is negative. It is as positive as the assertion that one has seen the Rocky Mountains.

If one testifies that he watched a circus parade and that he saw no elephants in it, is his testimony negative? Of course not. It is positive, because it is a matter of simple logic that, possessing good eyesight, he could not fail to see an elephant if it went by him.

The plaintiffs in this case were injured at a railroad crossing when a locomotive of the defendant Pennsylvania Railroad Company struck the tractor-trailer in which they were riding. The jury returned a verdict for the plaintiffs and the trial court ordered a new trial, stating that the verdict was against the weight of the evidence. Both plaintiffs testified that the locomotive gave no warning by whistle or bell as it bore down on them out of a mist caused by a cold rain coming into contact with the warm ground. A disinterested witness, Dr. Michael J. Polino, testified that he was in a building located next to the railroad

tracks at the time of the accident and that he did not hear the locomotive give any audible warning of its approach before it struck the plaintiff. The trial court ruled out Polino's testimony on the basis that it was "negative" testimony, adding: "He was not being attentive to the approach of the train, and therefore hardly in a position to know what had transpired in the matter of giving signals of the approach of this train."

This is indeed a strange argument. What is meant by "being attentive" to audible phenomena? One does not have to be attentive in order to hear a clap of thunder; one does not have to be attentive in order to hear a pistol shot. Conversely, one does not have to be attentive to know that there was no thunder and there was no pistol shot. The shrill of a locomotive whistle is such that no one can possibly ignore it if it is sounded, and, by the same obvious deduction, one with normal hearing is certainly capable of saying, immediately after the moment of alleged shrilling, whether there was any shrilling or not. The test in this type of a situation should not be whether a person is "being attentive", but whether his hearing is normal.

If one's hearing is such that he can only hear a locomotive warning when he is being attentive to hearing it, he may be run down by the locomotive which blows the whistle. A warning of danger, if it is to be of any use, must be such that it warns the person who is not thinking of danger. The warning must be of such a character that its appearance, audible or visual, startles the listener whether he is attentive or not. By the same token, the absence of that startling experience is also an event to be remembered, especially when the presence or absence of the warning is immediately associated with a tragic occurrence

which focuses the memory on all phenomena which preceded it.

It is not disputed that Dr. Polino's hearing was normal and his senses sound. He was standing close to the tracks when the auto-trailer of the plaintiffs was hit by the locomotive. Simultaneously with the happening of the accident the first question which would instinctively form in Dr. Polino's mind would be: How did this accident happen? Then: Why did the accident happen? And in that instant he could not avoid questioning himself as to whether the locomotive had sounded any warning. Dr. Polino answered that question by affirming that the locomotive had not sounded any warning. How, then, can such a definitive, positive averment be regarded as negative?

Under the theory advanced by the Trial Judge in this case, and affirmed by the Majority of this Court, a person injured at a railroad crossing can never recover if his statement that no warning was sounded is contradicted by the railroad because, where would he be able to find a witness who could testify that the only object he had in life at the moment before the accident was to ascertain whether the locomotive would sound a warning whistle or not?

The Majority Opinion points out that the engineer and fireman both testified that the engineer: "gave four blasts of the whistle,—two long, a short and a long—, and at the same time opened the automatic valve which rang the bell continuously to the crossing."

Is it possible that Dr. Polino could ignore such an audible commotion if it had actually occurred? The blasts of a locomotive whistle are not the squeaks of a peanut roaster, and the continuous ringing of a locomotive bell is not the intermittent and feeble clank

of a cow bell as its wearer languidly rises from a verdant pasture in which she has been contentedly ruminating her herbivorous cud.

Short of evidence that Dr. Polino is as deaf as the Sphinx, his testimony that the locomotive did not sound warnings was positive testimony—and it was believed by the jury. There is nothing in the record to suggest that Dr. Polino was a partisan supporter of the plaintiffs. There is nothing in the record which suggests that he had any interest in the case other than to expect that justice would be done as everyone has the right to expect it will be done when he goes into a courtroom.

Moreover, if there were any faults in the manner in which Polino testified, the tribunal to determine those faults and appraise them was the jury, but the jury found no probative fault in Dr. Polino. The jury heard the testimony of the engineer and fireman and refused to believe them.

The Majority Opinion says that the testimony of the engineer and fireman was strengthened by statements made by the plaintiffs within a few days after the accident. The Majority Opinion quotes from the driver Ulrich's statement as follows: "I do not remember whether or not I made a full stop before I went up on the crossing. I don't think I did . . . I don't think I was to a full stop but I do know I slowed down."

This quotation omits the very significant remark by Ulrich, namely: "I have been trying to figure that out ever since then." It would seem quite clear from all the circumstances surrounding the formation of the statement (which incidentally was taken in the hospital where Ulrich was suffering from his grave injuries) that he didn't remember whether he had stopped or not. Ever since the collision, which had

occurred six days before, he had been trying to "figure" out whether he had or had not stopped. At the trial Ulrich testified that he did bring the tractor-trailer to a stop before he committed himself to the crossing. If there was an inconsistency between what Ulrich said at the trial and what appeared in the hospital statement, it was for the jury to determine what to believe. The jury could well have believed that the horrible fright which seized Ulrich when he saw the train suddenly burst out of the mist and the haze could have been of such a nature that even six days later he could not honestly say whether he had stopped or not. He described the terror of the collision in the following vivid language: "Burd said, 'There's an engine' and I looked to my left and there it was. I remember that; I can see that engine. I think I will see that engine forever. We were on the tracks; I can't tell you which one. If I would have slammed those brakes on, the engine would have hit the cab. I think that's what made me want to push that throttle down and it just seemed as if it wouldn't move. After I saw that engine, *it scared the daylights out of me*. I don't know at what speed the train was approaching us. When I first saw the engine, I don't know whether it was just a wish in my mind, but it seemed to me that it was stopped. It looked as if it was right on top of us."*

There is scientific basis for the theory that a person who has suffered an overwhelming fright, succeeded by serious injury, may be better able to reconstruct what occurred at the crucial moments of the disaster after a substantial period of time has elapsed than he can within the days immediately following the violence done his person and his senses.

---

* Italics throughout, mine.

This may or may not have been argued to the jury but there can be no doubt that the railroad company's opposing position was pressed vigorously to the jury— and it was rejected.

Why is it necessary then to have another trial on the same issue? Both sides were represented by very able counsel, the record shows no trial error, the charge was eminently fair to both sides, the jury was an intelligent one which not only heard all the testimony presented in court, but visited the scene of the accident in order thoroughly to understand and grasp the contentions of both parties. What more can be done at a subsequent trial?

The Majority Opinion says: "It is not the province of the court to resolve conflicts in the testimony or to usurp the function of the jury, but it is the duty of a trial court to pass upon the weight of the evidence and to grant or withhold a new trial accordingly."

But in the case of *Carroll v. Pittsburgh,* 368 Pa. 436, where the present writer was the Trial Judge, and he granted a new trial because he believed the verdict was against the weight of the evidence, this Court reversed his order and said: "A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion: Wilson v. Kallenbach, 332 Pa. 253, 255, 256, 2 A. 2d 727, 728. Neither should it ordinarily be granted on the ground that the *verdict was against the weight of the evidence* where the evidence is conflicting and the jury might have found for either party."

If it was not proper to grant a new trial in the *Carroll* case, what superior virtue is found in the Trial Judge's decision in this case? As was true in the *Carroll* case the evidence in the case at bar was

conflicting and the jury might have found for either party. If the review of this Court of the Trial Judge's decision in the *Carroll* case was *negative*, why is it *positive* in reviewing the decision of the Trial Judge's decision in the case at bar?

Where is the consistency?

Where is the logic?

I dissent.