**Simon v. Isaacson**

*Marshall A. Bernstein,* for plaintiffs.

*Perry S. Bechtle,* for defendant.

DiBONA, J., July 20, 1972.—This action arises out of the alleged failure of defendant, Dr. Howard Isaacson, to diagnose an incidence of breast cancer. The matter now before this court is a motion by defendant for judgment n.o.v. or a new trial, following a jury verdict for plaintiffs, Minna and Julius Simon, in the amount of $50,000 and $25,000, respectively. Preliminarily, it may be noted that no one denies that Minna Simon was stricken with breast cancer. The controversy centers on the issue of the failure to detect the malignant tumor and the question of whether metastatic cancer developed by reason of the failure to provide proper medical treatment.

The salient facts adduced at trial are as follows. Minna Simon placed herself under the care of defendant, a board-certified gynecologist, in 1957. Prior to 1966, her principal malady was cystic mastitis, a benign condition, in the outer part of her left breast. Dr. Isaacson's usual procedure was to prescribe diuril, a diuretic efficacious in the treatment of this condition, and to tell plaintiff to return in six months.

In June of 1966, plaintiff allegedly informed Dr. Isaacson that she had detected a lump in her left breast. According to plaintiff, this lump was entirely different from the little cysts, i.e., cystic mastitis, by which she was plagued. Dr. Isaacson told her not to worry, to continue on diuril, and to return in six months. In March of 1967, plaintiff reported that the lump had grown larger. Similarly, in June of 1967, although not scheduled for an examination, plaintiff

visited Dr. Isaacson and repeated her complaint. On both occasions, the doctor advised her that nothing was wrong.

In August of 1967, plaintiff returned and stated that her condition had deteriorated. Following an examination, Dr. Isaacson directed her to go to Albert Einstein Medical Center for mammography. Instead, plaintiff went to Dr. Berthold Stern, a general practitioner, four days later. Dr. Stern's examination revealed gross swelling of the left breast with a hard indurated growth the size of a plum. He thereupon arranged for a mammogram and without awaiting the results scheduled a hospital admission for plaintiff on an emergency basis.

The mammogram indicated the existence of a malignant lesion. Plaintiff entered the hospital and, subsequent to a biopsy which confirmed this diagnosis, a radical mastectomy was performed. This operation, which results in the removal of the breast and all regional lymph nodes in the area together with the superficial muscles under the breast, is the procedure advocated by most doctors regardless of the size of the tumor. The pathologist's report on the excised breast described a tumor approximately six centimeters in diameter and concluded that the cancer had invaded twenty of twenty-two lymph nodes examined. In other words, the cancer had already metastasized.

The crux of Dr. Isaacson's defense on this aspect of the case was that Mrs. Simon never complained of a lump in her breast. For the most part he was compelled to rely on his office records since he could not recall the details of the visits. These records did not contain a complaint regarding a lump. And, added Dr. Isaacson, had such a significant complaint been proffered he would have recorded it promptly.

Dr. Isaacson averred that on each visit he palpated plaintiff's breasts and found nothing amiss. His record of the March 1967 visit indicated that he felt numerous small glands but no dominant mass. His record of the June 1967 visit contained the notation, "Still has about a six-to-seven centimeter area of cystic glands in the outer part of her left breast." This reference was to a condition which had existed for some time, possibly since 1957. Dr. Isaacson concluded by stating that he detected a subtle change in plaintiff's condition during the August of 1967 visit and decided to secure a diagnostic evaluation.

There is no real dispute regarding the proper and accepted medical standard of care. Disagreement between plaintiff's expert and defendant's experts arose because they hypothesized from variant facts. Plaintiff's witness assumed that plaintiff was able to feel a lump and complained thereof to defendant; whereas, defendant's witnesses assumed the nonexistence of a complaint. All agreed, however, including Dr. Isaacson, that if plaintiff detected a lump and so advised defendant then reasonable medical standards dictated either a mammogram or a biopsy, depending on the degree of suspicion. Dr. Clark, called by plaintiff, added that these tests are also required when a patient suffers from chronic cystic mastitis. Nevertheless, we deem it unnecessary to consider the conflicting testimony on this particular opinion.

Essentially, the jury's task was to determine whether a complaint had been made. For, the expert opinions were only as credible as the facts upon which they were based: Kelly v. Martino, 375 Pa. 244 (1953). And, although a doctor is not a guarantor of his treatment, Donaldson v. Maffucci, 397 Pa. 548 (1959), and is not responsible for mere errors in judgment, Duckworth v. Bennett, 320 Pa. 47 (1935),

it cannot be gainsaid that liability emanates from his failure to utilize the scientific apparatus available to him to supplement his clinical impressions: Smith v. Yohe, 412 Pa. 94, 105 (1963).

Apparently, the jury has concluded that plaintiff complained of a lump and defendant negligently failed to order further studies. This court will not displace that determination. There was ample evidence to support plaintiff's position particularly since the jury might well have found that Dr. Isaacson's version that no complaint was made because he had no record of one merely begged the question.

The crucial issues at hand are whether the outcome would have been altered medically if Dr. Isaacson had diagnosed the condition at one of the earlier visits and whether plaintiff has sustained any legally cognizable injuries inasmuch as a radical mastectomy would have been required in any event. Both questions focus on the phenomenon of metastasis.

Everyone is aware of the importance of early detection of cancer. Indeed, our literature and advertisements are constant reminders of this message. What everyone may not know is the purpose of early detection. Briefly stated, it is to prevent metastasis, a process by which one or more cells break from the primary site or lesion and travel to other parts of the body via the blood vessels or the lymph vessels. With the onset of metastasis, a patient's chances of survival are substantially diminished.[1]

Regarding plaintiff's physical state at the time of trial, defendant correctly notes that none of the numerous tests performed on plaintiff after her opera-

---

[1] Perhaps the most striking dramatization of the seriousness of the disease is the medical profession's absolute refusal to speak of treatment in terms of a cure rate: it is always in terms of a survival rate.

tion revealed that the cancer had metastasized beyond the lymph nodes. He also asserts that none of the doctors called by plaintiff was able to state definitively that the cancer had metastasized. We disagree. Collectively, the new sites of the malignancy were pinpointed as follows: neck (Dr. Stern), breastbone (Dr. Stern and Dr. Behrend), breast, bone, pleura, and, possibly, liver (Dr. Levick), and brain (Dr. Levick). The record is also replete with phrases such as: "Suffering from a serious disease . . . that sapped her strength" (Dr. Stern), "I don't think it's an extension, I think it's a spread" (Dr. Levick), "In my opinion I think she is loaded with it" (Dr. Levick), and "I feel very, very certain that she has metastasis to the brain" (Dr. Levick), to describe plaintiff's postoperative condition.

We find these opinions sufficiently positive and consistent. We hasten to add that the testimony challenged by defendant came from physicians charged with the responsibility of keeping plaintiff alive and the mere fact that defendant may disagree with their diagnoses and prognoses based on their clinical observations is not ground for overturning the verdict.

Defendant also argues that plaintiff did not establish causation. In this regard, plaintiff must show that the cancer would have been cured had due care been exercised. We are convinced that plaintiff has adequately met this burden.

Plaintiff's sole witness on this question was Dr. Eugene Clark, a board-certified internist and pathologist. Dr. Clark testified that on the basis of his microscopic examination of the tissue the primary lesion had existed for at least six months before it was detected. Furthermore, if plaintiff could feel a lump in June of 1966 then the cancer was present at that time. In contrast, the metastatic growth was of more

recent origin and was not in the lymph nodes in June of 1966 since some of the nodes had large masses of cancer cells rapidly growing and proliferating without any scar tissue around them. The following colloquy then ensued regarding causality:

"Q. Now, Dr. Clark, in your medical opinion, would the outcome of this case medically have been altered in any way if the doctor had done anything different at that last visit, in August of 1967?

"A. No.

"Q. In your professional opinion would the outcome . . . medically have altered if any different care . . . had been rendered at one of the earlier visits?

"A. Yes.

"Q. Doctor, do you have an opinion as to whether if the tumor had been removed at that time, as to whether a cure could or could not have been effected?

"A. A cure could have been effected.

"Q. Why?

"A. Because . . . there was a high degree of probability that no metastasis had occurred. And even had metastasis to the lymph nodes have occurred . . . it will still have been possible to remove the cancerous lymph nodes, which is always being done. And, if the lymph node involvement is not too extensive, and there is no spread beyond the lymph nodes, a cure is still effected."

Dr. Clark next answered that a cure could have been effected if the cancer was removed in March of 1967. The doctor was less than positive about June of 1967, but thought that a cure was possible. He concluded by stating that in his opinion the five to six centimeter area detected by Dr. Isaacson was not cystic mastitis but cancer.

Defendant objects to this testimony on two grounds. First, he urges that Dr. Clark was not qualified to testify as an expert on this issue. Secondly, defendant argues that Dr. Clark failed to testify positively and unequivocally.

Preliminarily, counsel for defendant failed to object to Dr. Clark's qualifications at trial; a motion to strike was made but solely on the ground that Dr. Clark was unsure of his opinion. Hence, it would appear that the issue cannot be raised at this time. See Pennsylvania Co. v. Philadelphia Electric Co., 331 Pa. 125, 133 (1938); Walker v. Walker, 254 Pa. 220, 230-31 (1916). In any event, Dr. Clark's testimony was based on an examination of the pathologist's slides, an examination peculiarly within his grasp as a pathologist, and his general knowledge of the incipiency of cancer, a knowledge which is not restricted to gynecologists. Hence, we find that we have not abused our discretion in permitting Dr. Clark to testify. See Abbott v. Steel City Piping Co., 437 Pa. 412 (1970).

Defendant's contention that Dr. Clark's testimony was equivocal is equally devoid of merit. The law is clear. Since the facts are beyond a layman's purview, expert testimony is indispensable. Furthermore, since the verdict cannot rest on speculation, the expert must testify, "[N]ot that the condition of claimant might have, or even probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence . . .": Menarde v. Philadelphia Transp. Co., 376 Pa. 497, 501 (1954). See also McMahon v. Young, 442 Pa. 484 (1971); Warden v. Lyons Transp. Lines, Inc., 432 Pa. 495 (1968).

Defendant's primary grievance with Dr. Clark's

testimony is the statement that if proper care had been exercised a cure could, rather than would, have been effected. Defendant thus attempts to accomplish with one word what he failed to do in 682 pages of testimony. Adages to the contrary notwithstanding, we do not believe that a single word should wield such power. A common-sense interpretation of Dr. Clark's testimony is that the outcome would have been altered medically because a cure could have been effected if due care had been exercised. Viewing the testimony in its proper context, it is evident that the word "could" is not illustrative of doubt or speculation; instead, the word "can" is being employed in its past tense to indicate what might have been. We have no reason to believe that our stringent requirements for competent medical testimony are intended to proscribe an opinion stated in these terms.[2]

Defendant has also assigned a number of reasons in support of his motion for a new trial. To the extent that several of these grounds have already been discussed, we reiterate our previous conclusions. The remaining challenges will be considered *ad seriatim.*

Defendant's first contention is that the verdict was excessive. After hearing testimony from plaintiff describing her post-operative existence as utter tor-

---

[2] We note in passing that as difficult a subject as cancer etiology and cure may be and as covert the answers to many of the scientific questions may be, we are not opting for a diminution in plaintiff's burden of proof. In fact, we find that plaintiff has sufficiently sustained her burden. We wish to point out however, that any more positive a statement regarding plaintiff's diagnosis and prognosis, particularly from a profession whose members are, understandably so, sensitive to any such predictions in any type of case, and any further testimony regarding what might have been had due care been exercised are undoubtedly beyond the scope of mortal intellect.

ment, including submission to chemotherapy and cobalt treatment, the latter process leaving her severely burned, the paralysis of her left vocal chord, with the incessant anxiety about choking incidental thereto, the inability to function as a nurse, a housewife, or a wife, and the awesome knowledge that death is imminent, we strenuously disagree, particularly since all of defendant's arguments are posited on assumptions contrary to the jury's findings, which findings we have already upheld.

Defendant next argues that the trial judge directed prejudicial questions to defendant and his witnesses. We deem it unnecessary to repeat each question cited by defendant as evidence of error. His main objection is that the trial judge asked several expert witnesses called by defendant to assume that Mrs. Simon had complained of a lump. These questions were obviously intended to define fully Dr. Isaacson's duty to plaintiff, thereby enabling the jury to appreciate fully defendant's compliance *vel non* with the appropriate medical standard of care. We regard such questions as imperative if a trial judge is to meet his obligation to elicit information which will guarantee complete awareness of the facts by the jury. Failure to do so would relegate a trial judge to the position of a moderator and constitute dereliction of his duty. See Welsbach Street Lighting Co. v. Philadelphia, 318 Pa. 166 (1935).

Defendant's final assertion is that the trial judge accentuated plaintiff's position by devoting a disproportionate amount of time to it during his charge to the jury. Defendant fails to perceive, however, that much of what he considers objectionable arises from the nature of a charge: many dates, facts, and concepts discussed in reference to plaintiff's claim would be unnecessarily reiterated in delineating

defendant's position. In any event, the jury was instructed repeatedly that their recollection of the facts was paramount and they were entitled to disregard any remarks made by anyone, including the trial judge, which were not reconcilable with their understanding of the facts. Consequently, we do not, in the final analysis, agree that defendant was prejudiced by the charge to the jury. See Keating v. Belcher, 384 Pa. 129 (1956).

Accordingly, the motions for judgment n.o.v. and/or a new trial are denied as per order heretofore filed.

